Silas Owendoff ANGEL, Appellant,

v.

The STATE of Texas, Appellee.

No. 912–85.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 7, 1987.

Russell C. Busby, Austin, for appellant.

John B. Holmes, Jr., Dist. Atty., William J. Delmore, III and Gladys Aguero, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

CAMPBELL, Judge.

Appellant was convicted of theft of property valued between $200 and $10,000. V.T.C.A., Penal Code § 31.03(d)(4)(A) (1974). Punishment was assessed at confinement for five years in the Texas Department of Corrections. The Houston (14th) Court of Appeals affirmed, holding, *inter alia*, that city police officers have county-wide jurisdiction to make warrantless arrests. *Angel v. State*, 694 S.W.2d 164, 170 (Tex.App.—Houston [1st Dist.] 1985).

We granted appellant's petition for discretionary review to determine whether a Tomball city police officer, while patrolling outside the Tomball city limits, had authority and jurisdiction under Texas law[1] to make a warrantless arrest of appellant.[2] We will affirm.

### I.

Shortly after 4:00 a.m. on August 29, 1983, Tomball City Police Officers Toombs and Vaughn were on routine patrol along the eastern edge of the Tomball city limits.[3] While patrolling *outside* the city limits of Tomball but inside Harris County, they observed appellant driving a piece of heavy road paving equipment[4] in the dark, without any lights and on a public road.

The officers stopped appellant and asked him for "some type of identification" and "what he was doing." (R. IV–10). Appellant informed them "that he [appellant] worked for Bell Construction and that he was moving the vehicle or the backhoe to another job site." (R. IV–10).[5] The officers communicated with their dispatcher by radio and requested a check on appellant's name and driver's license number. Prior to receiving a response from the computer check, Officer Toombs completed questioning appellant and advised him to drive on the shoulder of the road because the vehicle had no lights. Appellant then resumed driving down the road.

As appellant drove away, the officers were informed by their dispatcher that the Department of Public Safety had an "open

1. No federal constitutional question was included in our grant of review. Our decision only addresses state law. See *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983).

2. We granted review because "the justices of a court of appeals have disagreed upon a material question of law necessary to its decision." Tex. R.App.Proc. 200(c)(5). In the instant case, a panel of justices relied upon another panel's decision in *Lopez v. State*, 652 S.W.2d 512 (Tex. App.—Houston [1st Dist.] 1983) (Duggan, Smith and Levy, JJ.) (municipal police officers have county-wide jurisdiction), rev'd on other grounds, 708 S.W.2d 446 (Tex.Cr.App.1986) (opinion on second rehearing), to determine the territorial jurisdiction of city police officers. *Angel*, supra (Pressler, Murphy, and Draughn, JJ.). However, after the instant case had been decided, yet another panel of justices concluded that *Lopez*, 652 S.W.2d 512, was "in error." *Love v. State*, 687 S.W.2d 469, 472 (Tex.App.— Houston [1st Dist.] 1985, pet. ref'd) (Evans, C.J., Cohen and Smith, JJ.) (municipal police officers have city-wide jurisdiction).

Appellant filed a motion for rehearing in the Court of Appeals, arguing that his case must likewise be in error. However, the Court of Appeals declined to resolve this conflict. See *Angel v. State*, 694 S.W.2d 164 (Tex.App.—Houston [1st Dist.], 1985) (opinion on rehearing) (Murphy, J., dissenting). We granted review to resolve this conflict.

3. These facts are summarized from the evidence presented in the hearing before the trial court on appellant's motion to suppress.

4. Although called a "backhoe" throughout the trial, the vehicle actually was a tractor with a front-end loader and a backhoe attached. (R. V–47).

5. Appellant did not testify during the hearing on his motion to suppress. Officer Toombs presented this information in the form of hearsay testimony. Neither the State nor appellant objected.

traffic warrant" on appellant. (R. IV–13). The officers again stopped appellant and waited for the dispatcher to confirm that the warrant was still valid. While waiting for confirmation, Officer Toombs "observed a red wire attached to the starter [of the tractor]." (R. IV–14). Based on his experience, Officer Toombs believed that the wire had been used to "hot wire" or "bypass the key switch" on the tractor. (R. IV–15). Meanwhile, the officers received confirmation that there were two warrants on appellant out of Walker County for speeding and failure to appear. Appellant was then placed under arrest "for the traffic warrants" and "for investigation of the possible theft." (R. IV–16).

## II.

Prior to trial, appellant filed a motion to suppress all evidence seized as a result of his detention, including the tractor and his oral statements.[6] During a pre-trial hearing, appellant's attorney argued that 1) the Tomball police officers were acting "outside the jurisdiction of [their] authority under [Article] 2.13 of the Code of Criminal Procedure," [7] 2) appellant was violating no laws when he was stopped, and 3) appellant's oral statements following his arrest were not taken down "in compliance with Article 38.22 of the Code of Criminal Procedure." (R. IV–34). The trial court suppressed all oral statements made by appellant at the time of his arrest. However, the trial court denied the motion to suppress insofar as it applied to the tractor.

## III.

In its brief before this Court, the State challenges, for the first time,[8] appellant's standing to complain of his allegedly illegal arrest. We must first determine whether such a belated claim is possible.

In *Wilson v. State*, 692 S.W.2d 661 (Tex. Cr.App.1984), this Court held that the State could challenge, for the first time on appeal, a defendant's standing to complain of an illegal search or seizure. Because the State raised the issue before the court of appeals in *Wilson*, supra, our holding must be understood to allow the State to challenge standing for the first time on *direct appeal*. Following the Supreme Court's reasoning in *Combs v. United States*, 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed. 308 (1972), this Court recognized that standing was a substantive element of a defendant's search and seizure claim, and the burden for establishing that element lies with the defendant. *Wilson*, supra, at 669. Therefore, we "no longer view[ed] the absence of a challenge to a defendant's standing [on direct appeal] as a 'failure' of the government's." *Id.* However, different considerations apply on *petition for discretionary review*.

Our state constitution limits this Court's discretionary appellate power to review of "a decision of a Court of Appeals in a criminal case as provided by law." Tex. Const. art. V, § 5; see also Tex.R.App. Proc. 202(a). Our own rules of procedure further limit our review to those particular

---

**6.** The record actually contains three motions to suppress. Two of the motions are identical except for the cause numbers, which changed following reindictment of appellant, and were filed by the same attorney. The third motion was filed by appellant's other attorney.

The first two identical motions do not cite any authority under state law (constitutional or statutory) for suppressing the evidence. The second motion cites the Fourth Amendment of the United States Constitution, Article I, § 9, of the Texas Constitution and Chapter 14 of the Code of Criminal Procedure as authority for finding appellant's arrest illegal. However, no authority under state law (constitutional or statutory) is cited for suppressing the evidence seized as a result of the illegal arrest, e.g., Article 38.23, V.A.C.C.P. (1979) (mandating suppression of evi-

dence obtained in violation of state or federal law).

Because no constitutional or statutory violation is present in the instant case, see discussion, *post*, we need not decide whether appellant waived whatever remedy under state law might have been available.

**7.** Article 2.13, V.A.C.C.P. (1977), in pertinent part, provides: "It is the duty of every peace officer to preserve the peace *within his jurisdiction.*" (emphasis added).

**8.** In its brief before the Court of Appeals, the State only argued that no evidence obtained as a result of the alleged illegal arrest was admitted into evidence during trial, thus rendering harmless the trial court's ruling on appellant's motion to suppress.

grounds raised in the petition and granted by this Court. Tex.R.App.Proc. 202(d)(4); see *McCambridge v. State*, 712 S.W.2d 499, 500 n. 2 (Tex.Cr.App.1986) (discretionary review strictly limited to ground raised and granted in petition); *Eisenhauer v. State*, 678 S.W.2d 947, 956 (Tex.Cr.App.1984) (Clinton, J., dissenting) ("Our grant of review was no broader than the ground presented...."). By doing so, we narrow our appellate focus to a particular issue, thus avoiding wholesale review of an entire case. See, e.g., *McCambridge*, supra, at 501 n. 6 (issue on voluntariness of consent not granted for review). Given these constitutional and procedural restrictions upon our review power, "our [discretionary] review is limited to those points of error decided by the courts of appeals, included in petitions for discretionary review and granted as grounds for review." *Arline v. State*, 721 S.W.2d 348, 353 n. 9 (Tex.Cr. App.1986).

These principles require the parties to obtain a decision by a court of appeals on a particular issue before seeking review of that decision by this Court. By failing to present a court of appeals with an issue to decide, a party may waive the opportunity to litigate the same issue before this Court.

In the instant case, the State did not present the issue of standing to the Court of Appeals as an independent ground for upholding the trial court's ruling on the motion to suppress. Consequently, the Court of Appeals did not decide whether appellant had standing to complain of any search or seizure violation. Without a decision by the Court of Appeals on that issue, this Court has nothing to accept for review regarding appellant's standing. Therefore, we find that the State has waived the right to challenge appellant's standing to complain of his detention, arrest and the subsequent seizure of the tractor.[9]

### IV.

Returning to the ground for review granted by this Court, we begin by noting that appellant challenges the legality of his warrantless arrest on two distinct bases. First, he argues that Officer Toombs had no authority under state law to make a warrantless arrest. Second, he argues that even if Officer Toombs had authority for making a warrantless arrest, he acted outside his territorial jurisdiction by arresting appellant outside the Tomball city limits.[10] We must first determine whether Officer Toombs had authority to make a warrantless arrest.

#### A. Authority for Warrantless Arrest

The Court of Appeals held that Officer Toombs had no authority to make a warrantless arrest of appellant for operating a tractor without lights because it did not constitute an offense under state law. *Angel*, supra, at 170. However, the Court of Appeals went on to find that "appellant was a 'suspicious individual' properly subjected to an investigatory stop." *Id.* (relying upon *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The Court of Appeals found that Officer Toombs, after releasing appellant, subsequently acquired cause for a second stop because of the discovery of traffic warrants, followed by the development of probable cause for a warrantless arrest upon discovering that the vehicle had been "hot-wired." *Id.* The Court of Appeals also found that Officer Toombs had an independent basis for initially stopping appellant: to protect "public

**9.** If the State had presented the issue of standing to the Court of Appeals and that court then decided the issue in appellant's favor, the State would be required to file its own petition for discretionary review raising standing as a specific ground for review. A party should not be expected to seek discretionary review on an issue already decided in his favor. Cf. *Wilson*, supra (after court of appeals decided standing in State's favor, appellant filed petition for discretionary review raising standing as ground for review).

**10.** In the opening paragraph of his dissent, Judge Clinton would have it that this whole issue is moot [premature?] because the record is silent as to the corporate status of Tomball. And, while we find the appendix to his dissent to be informative and enlightening, we note that no person or thing, not the appellant, the State, the trial court, or the Court of Appeals, has ever questioned that status at any stage of the judicial process, nor will we at this late hour.

safety on the highways of Harris County," regardless of the absence of any legal violation committed within Officer Toombs' view. *Id.* at 170–71.

■ Appellant argues that the Court of Appeals correctly held that "it is not against the law to drive road-paving equipment without headlights." *Id.* at 170. Relying upon that premise, appellant concludes that Officer Toombs' subsequent discovery of evidence that the tractor was stolen was tainted by the initial unlawful stop.

The State argues that the Uniform Act Regulating Traffic on Highways, V.A.C.S., Art. 6701d, (hereinafter Uniform Act) provides that road-paving equipment must be operated with lights if operated at night. We agree.

Article XIV of the Uniform Act prescribes the equipment, including lighting, that must be installed on vehicles operating on public highways. V.A.C.S., Art. 6701d, §§ 108–139F (1977 & Supp.1986). "Road machinery" is excluded from those requirements, "except as herein made applicable." *Id.* at § 108(c). Road machinery is thereafter included among those vehicles that must comply with the lighting requirements when such machinery is operated upon a state highway at any time from a half hour after sunset to a half hour before sunrise. *Id.* at §§ 109(a) & 122(e). Therefore, the Court of Appeals incorrectly held that "it is not against the law to drive road-paving equipment without headlights." *Id.* at 170. Given the existence of such an offense, we must now determine whether Officer Toombs was authorized to make a warrantless arrest of appellant.

"Any peace officer is authorized to arrest without warrant any person found committing a violation of any provision of [the Uniform Act]." V.A.C.S., Art. 6701d, § 153 (1977). In addition, "[a] peace officer may arrest an offender without a warrant for *any offense* committed in his presence or within his view." Art. 14.01, V.A.C.C.P. (1977) (emphasis added).[11] City police officers are peace officers. Art. 2.12(3), V.A.C.C.P. (Supp.1986).

■ In the instant case, Tomball City Police Officer Toombs observed appellant operate road machinery without proper lighting for more than one half hour prior to sunrise. Given these facts, Officer Toombs, as a peace officer, had probable cause to believe that a traffic offense had occurred in his presence or within his view. Therefore, under either Article 6701d, § 153, supra, or Article 14.01, supra, he was authorized to make a warrantless arrest of appellant.

After Officer Toombs stopped appellant, further probable cause developed with the discovery of traffic warrants and evidence that the tractor was stolen. However, we need not determine whether Officer Toombs was authorized to arrest appellant without a warrant upon these independent facts because the traffic offense alone was sufficient to authorize a warrantless arrest. See *Vicknair v. State,* No. 036–84 (Tex. Cr.App., Sept. 17, 1986, motion for reh'g pending) (not yet reported) (crack in tail light lens created probable cause to arrest); *Williams v. State,* 726 S.W.2d 99 (Tex. Cr.App.1986) (not yet reported) (parking on wrong side of street created probable cause to arrest).[12] Therefore, we hold that Officer Toombs had authority to make a warrantless arrest of appellant. We express no opinion as to any alternative authority used

---

**11.** These overlapping provisions seemingly authorize a peace officer to arrest a defendant without a warrant only for an offense *actually* committed. However, this Court has construed such statutes to require only that the peace officer have sufficient facts occur in his presence or within his view for him to reasonably conclude that an offense is being committed. *Drago v. State,* 553 S.W.2d 375, 377 (Tex.Cr.App. 1977) (citing *Soileau v. State,* 156 Tex.Cr.R. 544, 244 S.W.2d 224, 225 (1951), aff'd. on reh'g, 244 S.W.2d 225).

**12.** The State argues that Officer Toombs had independent authority under Article 18.16, V.A. C.C.P. (1977), to make a warrantless arrest of appellant and seize the stolen tractor "to prevent the consequences of theft." However, the correctness of that authority was neither presented to nor decided by the Court of Appeals. Consequently, it was not preserved for review. See discussion, supra, at 729–730.

by the Court of Appeals for upholding Officer Toombs' warrantless arrest of appellant.

### B. Jurisdiction

■ Article 6701d, § 153, supra, and Article 14.01, supra, seem to grant peace officers unlimited geographic jurisdiction for making warrantless arrests committed in their presence or within their view. Indeed, in the past, this Court has held that such statutes authorize a peace officer to make warrantless arrests for such offenses if committed *anywhere* in the State. See, e.g., *Hurley v. State*, 234 S.W.2d 1006, 1007, 155 Tex.Cr.R. 315 (1950). In fact, this Court has approved a city police officer's warrantless arrest of a defendant under facts strikingly similar to the instant case. *Winfield v. State*, 163 Tex.Cr.R. 445, 293 S.W.2d 765 (1956) (approving arrest of defendant without warrant outside the city limits by city police officer for operating a motor vehicle upon a public highway at night *without lights*).

Applying *Winfield,* supra, it would seem that Officer Toombs acted within his territorial jurisdiction by arresting appellant *in Texas* for commission of a traffic offense in his presence or within his view. However, this Court has recently begun to reexamine the statutory basis for granting peace officers such broad territorial jurisdiction to make warrantless arrests. See *Preston v. State,* 700 S.W.2d 227 (Tex.Cr.App.1985).

In *Preston,* this Court analyzed the statutory origin of a campus peace officer's jurisdiction. Despite the existence of broad authority for peace officers to make warrantless arrests, see, e.g., Chapter 14, V.A.C.C.P. and Article 6701d, § 153, supra, we held that campus peace officers have authority to act only "while on the property under the control and jurisdiction of the institution of higher learning [which employed him] or otherwise in the performance of his duties." *Id.* at 229 (quoting V.T.C.A., Education Code § 51.203 (1972)). That holding required this Court to recognize that statutes which confer upon a peace officer the authority to act may not necessarily define the geographic scope of that authority. That geographic scope, if absent from the statute granting authority to act, must find its source in some other statute.

In Article 6701d, § 153, supra, and Article 14.01, supra, the Legislature has obviously provided peace officers with authority to make warrantless arrests under certain circumstances. However, those statutes are silent as to the jurisdiction of a peace officer to make such warrantless arrests. Following our reasoning in *Preston,* the legislative expression of a peace officer's jurisdiction must be found in some other statute or be controlled by common law. Therefore, to the extent that *Hurley,* supra, and its progeny hold that a peace officer can make warrantless arrests *anywhere* in the State, they are overruled.

■ After examining V.A.C.S., Arts. 998 & 999,[13] the Court of Appeals found that

---

**13.** Article 998, supra, provides:

    The city or town council in any city or town in this State, incorporated under the provisions of this title may, by ordinance, provide for the appointment, term of office and qualifications of such police officers as may be deemed necessary. Such police officers so appointed shall receive a salary or fees of office, or both, as shall be fixed by the city council. Such council may, by ordinance, provide that such police officers shall hold their office at the pleasure of the city council and for such term as the city council directs, as the city council may require. *Such officers shall have like powers, rights, authority and jurisdiction as are by said title vested in city marshals.* Such police officers may serve all process issuing out of a corporation court anywhere in the county in which the city,

town or village is situated. If the city, town or village is situated in more than one county, such officers may serve the process throughout those counties.

(emphasis added).

    Article 999, supra, provides:

    The marshal of the city shall be ex officio chief of police, and may appoint one or more deputies which appointment shall only be valid upon the approval of the city council. Said marshal shall, in person or by deputy, attend upon the corporation court while in session, and shall promptly and faithfully execute all writs and process issued from said court. For the purpose of executing all writs and process issued from the corporation court, the jurisdiction of the marshal extends to the boundaries of the county in which the corporation court is situated. If the corporation court is

those statutes controlled a police officer's jurisdiction and held that city police officers have county-wide jurisdiction. *Angel,* supra, at 170. Because the city of Tomball is located within Harris County and Officer Toombs arrested appellant within Harris County, the Court of Appeals concluded that Officer Toombs acted within his jurisdiction. *Id.*

Appellant argues that the Court of Appeals in *Love,* supra, correctly decided that city police officers only have city-wide jurisdiction and thereby concludes that Officer Toombs exceeded his jurisdiction. The State argues that the Court of Appeals in the instant case correctly followed the statutory analysis in *Lopez,* supra, by holding that city police officers have county-wide jurisdiction.

The Legislature has provided that city police officers "shall have like powers, rights, authority and *jurisdiction* as are by said title vested in city marshals."[14] V.A. C.S., Art. 998 (Supp.1986) (emphasis added). City marshals,[15] "[i]n the ... *arrest of offenders,* ... shall have, possess and execute like power, authority, and *jurisdiction* as the sheriff."[16] V.A.C.S., Art. 999 (Supp.1986) (emphasis added). Therefore, at least in the "arrest of offenders," city police officers have the same jurisdiction as sheriffs.

"Each sheriff shall be a conservator of the peace *in his county....*" Art. 2.17, V.A.C.C.P. (1977). A sheriff's jurisdiction, therefore, is county-wide. Because a city police officer's jurisdiction for arresting offenders parallels a sheriff's jurisdiction, see Arts. 998 & 999, supra, it appears that a city police officer's jurisdiction is county-wide.

In *Love,* the Court of Appeals rejected this construction, holding instead that "jurisdiction," in the context of Articles 998 and 999, supra, only "refers to what the officer may do, not where he may do it." 687 S.W.2d at 472 (citations omitted). We disagree.

Jurisdiction is a comprehensive term, covering a variety of legal principles. In that sense, a police officer's jurisdiction can refer to either "the power, right or authority to interpret and apply the law" or "the limits or territory within which authority may be exercised." Webster's New Colle-

in a city which is situated in more than one county, the jurisdiction of the marshal extends to all those counties. He shall have like power, with the sheriff of the county, to execute warrants; he shall be active in quelling riots, disorder and disturbance of the peace within the city limits and shall take into custody all persons so offending against the peace of the city and shall have authority to take suitable and sufficient bail for the appearance before the corporation court of any person charged with an offense against the ordinance or laws of the city. It shall be his duty to arrest, without warrant, all violators of the public peace, and all who obstruct or interfere with him in the execution of the duties of his office or who shall be guilty of any disorderly conduct or disturbance whatever; to prevent a breach of the peace or preserve quiet and good order, he shall have authority to close any theatre, ballroom or other place or building of public resort. *In the prevention and suppression of crime and arrest of offenders, he shall have, possess and execute like power, authority, and jurisdiction as the sheriff.* He shall perform such other duties and possess such other powers and authority as the city council may by ordinance require and confer, not inconsistent with the Constitution and laws of this State. The marshal shall give such bond for the faithful performance of his duties as the city council may require. He shall receive a salary or fees of office, or both, to be fixed by the city council. The governing body of any city or town having less than five thousand inhabitants according to the preceding Federal census, may by an ordinance, dispense with the office of marshal, and at the same time by such ordinance confer the duties of said office upon any peace officer of the county, but no marshal elected by the people shall be removed from his office under the provisions of this article. (emphasis added.)

**14.** Prior to August 28, 1967, the term "jurisdiction" was absent from Article 998. See V.A.C.S., Art. 998 (1963). However, in 1967 the Legislature amended Article 998, placing "jurisdiction" alongside the "powers, rights, and authority" city police officers shared with city marshals. Acts 1967, 60th leg., p. 1171, § 2.

**15.** A city marshal is the ex officio chief of police. *Id.*

**16.** We note that Article 999, supra, does not include the term "rights" as appears in Article 998, supra. However, we need not presently address the implications, if any, of such an omission.

giate Dictionary 628 (5th ed. 1977). We must now determine which meaning the Legislature intended.

"[In the construction of all civil statutes,] words ... shall be given their ordinary meaning." V.T.C.A., Government Code § 312.002(a) (Supp.1986). However, "[i]f a word is connected with and used with reference to a particular trade or subject matter or is used as a word of art, the word shall have the meaning given by experts in the particular trade, subject matter, or art." *Id.* at § 312.002(b).

When speaking of a *court's* "jurisdiction," the term is quite broad and can have various definitions. See Black's Law Dictionary 766 (5th ed. 1979) (listing various types of judicial jurisdiction, e.g., ancillary, pendant, subject-matter, in personam, diversity). However, when speaking of a *peace officer's* "jurisdiction," the term takes on a more specialized meaning, particularly when placed alongside the terms "power," "rights" and "authority." See Articles 998 & 999, supra. If this Court is to presume that the Legislature has used different terms to describe different acts, then jurisdiction must mean something other than "the power, right or authority to interpret and apply the law." [17] In this sense, it is more logical that the Legisla-

ture included the term "jurisdiction" as a restriction on the geographic scope of a city marshal's and city police officer's power, rights and authority.[18]

This understanding of jurisdiction is also consistent with the context of its statutory use. See, e.g., Article 999, supra ("For the purpose of executing all writs and process issued from the corporation court, the *jurisdiction* of the marshal extends to the *boundaries of the county* in which the corporation court is situated.") (emphasis added).[19] Therefore, we hold that "jurisdiction," in the context of Articles 998 and 999, supra, refers to the geographic scope of a peace officer's power, rights and authority.

■ The Supreme Court reached this same conclusion in 1895 when construing the meaning of the term "jurisdiction" in Article 363, which preceded Article 999. *Newburn v. Durham*, 88 Tex. 288, 31 S.W. 195 (1895) ("jurisdiction" refers "to the territory in which such power or authority can be exercised"). Following the Supreme Court's decision in *Newburn*, the Legislature has met numerous times without amending Articles 998 or 999 to include language expressly limiting a city police officer's or city marshal's jurisdiction for

**17.** Indeed, if the Legislature understood "jurisdiction" to be synonymous with "power, rights and authority," it would have had no reason to add the term "jurisdiction" to Article 998 in 1967. See n. 13, *supra,* at 733. Of course, courts will not presume that the Legislature has done a useless act. *Hunter v. Fort Worth Capital Corp.,* 620 S.W.2d 547, 551 (Tex.1981).

**18.** Note also that the Legislature granted city councils the power to expand the "duties" performed and the "powers" and "authority" possessed by a city marshal. Article 999, supra. The Legislature did not grant city councils the power to expand a city marshal's "jurisdiction." That omission only makes sense if the Legislature understood "jurisdiction" to mean something other than "power, rights [or] authority."

**19.** We acknowledge that Article 999, supra, also provides:

[A city marshal] shall be active in quelling riots, disorder and disturbance of the peace *within the city limits* and shall take into custody all persons so offending against the peace

of the city and shall have authority to take suitable and sufficient bail for the appearance before the corporation court of any person charged with an offense against the ordinance or laws of the city.

(emphasis added). However, such language does not contradict our conclusion that Article 999 also grants city marshals county-wide jurisdiction to arrest offenders. By mandating that city marshals be "active in quelling riots, disorder and disturbance of the peace within the city," the Legislature has only indicated its preference that "riots, disorder and disturbance of the peace within the city" be given priority over other violations of the law. Nonetheless, when expressly referring to jurisdiction, Article 999 grants city marshals, and therefore city police, the same county-wide jurisdiction to arrest offenders as granted to sheriffs. Thus, the Legislature, by not using exclusive language, left city marshals and police free to arrest offenders county-wide while still giving priority to enforcement of certain laws within the city. This construction, consistent with V.T.C.A., Government Code § 311.021(2) (Supp.1986), gives a reasonable effect to the entire statute.

arresting offenders to the city limits.[20] Such inaction by the Legislature provides additional support for concluding that jurisdiction in Article 998 and 999 refers to geographic jurisdiction.

In *Love*, the Court of Appeals observed that the opinions of this Court have ignored the Supreme Court's holding in *Newburn*, supra, and have, instead, limited city police officers to city-wide jurisdiction. 687 S.W. 2d at 473. In particular, the Court of Appeals cited *Buse v. State*, 435 S.W.2d 530 (Tex.Cr.App.1968), *Minor v. State*, 153 Tex. Cr.R. 242, 219 S.W.2d 467 (1949), *Irwin v. State*, 147 Tex.Cr.R. 6, 177 S.W.2d 970 (1944), and *Weeks v. State*, 132 Tex.Cr.R. 524, 106 S.W.2d 275, 276 (1937). These cases do not support such a conclusion.

In *Weeks*, two city police officers stopped a driver after observing what "they thought were several cartons of beer." 106 S.W.2d at 275. They stopped the car beyond the city limits, although they first observed the car within the city limits. *Id.* After finding that the Legislature had not given the officers any authority to make warrantless arrests for unlawful transportation of liquor, the Court also noted that "Article 999, R.C.S.1925, seems to limit the legal authority of peace officers to their own bailiwick." *Id.* at 276. The Court based its reversal of the defendant's conviction upon the dual conclusions that the policemen "exceeded their legal authority in making the arrest of the [defendant] without a warrant and in making the search of her car beyond the corporate limits of said city." *Id.*

In *Weeks*, supra, the Court provided a gratuitous discussion of a peace officer's jurisdiction under Article 999, supra, despite eventually deciding the case on an unrelated independent ground. The Court also did not discuss the precedential value

of *Newburn*, supra, or the effect of the "power, authority and jurisdiction" clause in Article 999, supra. Furthermore, whatever persuasiveness that remained in *Weeks*, supra, on the issue of a police officer's territorial jurisdiction was subsequently removed in *Minor*, supra.

In *Minor*, two city police officers observed a defendant speeding within the city limits. They pursued the defendant and caught him outside the city limits after his car slipped into a ditch. 219 S.W.2d at 467–68. The Court began with the premise that the officers acted legally while within the city limits. *Id.* at 469. As to their actions once outside the city limits, the Court held them likewise legal based upon the doctrine of hot pursuit. *Id.* at 470. However, the Court also quoted approvingly from *Newburn*, where the Supreme Court "therein laid down the doctrine that by virtue of our statutes the chief of police or city marshal has the same jurisdiction as the sheriff of the county in the prevention and suppression of crime." *Id.*

More significantly, in responding to the defendant's motion for rehearing, the Court criticized part of its own holding in *Weeks*, supra:

> The opinion [in *Weeks*] ... makes the statement that the authority to make the arrest terminated at the city's boundary line. This general statement was not necessary to a decision of the case. We think it was an erroneous statement and should not be followed.

*Id.* at 471 (opinion on appellant's motion for rehearing).

In *Irwin*, in the context of deciding a related search and seizure claim, the Court noted that the territorial jurisdiction of policemen was restricted to the "confines of the city." 177 S.W.2d 970. The Court cited *Weeks* and other sources [21] to support

---

**20.** To the contrary, in 1967, the Legislature expressly expanded the county-wide jurisdiction of city marshals and police officers to include the additional purpose of executing writs and process from corporation courts. Acts 1967, 60th Leg., p. 1171, ch. 523, §§ 2 & 3. Previously, city marshals and police officers only had county-wide jurisdiction "[i]n the prevention and sup-

pression of crime and arrest of offenders." V.A. C.S., Art. 999 (1963).

**21.** *Ledbetter v. State*, 23 Tex.App. 247, 5 S.W. 226 (1887); *Peter v. State*, 23 Tex.App. 684, 5 S.W. 228 (1887); *Jones v. State*, 26 Tex.App. 1, 9 S.W. 53 (1888); 8 Am.St.Rep. 454; 4 Am.Jur. p. 13, § 17. In *Ledbetter, Peter* and *Jones*, the Court of Appeals merely held that state statutes restricted a sheriff's power to execute a *capias*

that claim. However, given the subsequent rejection of *Weeks*, see *Minor*, the precedential value of *Irwin* must be questioned.

Finally, in *Buse*, two city police officers, acting upon information given to them by a citizen, ventured outside their city limits and observed that a .defendant "had two yellow capsules in his right hand, between his thumb and forefinger." 435 S.W.2d at 531. They then made a warrantless arrest of the defendant. The Court, relying upon *Irwin*, held "that the arrest and search of [defendant] by the city officers outside the jurisdictional limits of the city ... was unlawful...." *Id.* at 532. However, given the earlier rejection of *Weeks*, which was the foundation for *Irwin*, the precedential value of *Buse* must also be questioned.[22]

In *Weeks*, supra, and its progeny, this Court did not undertake a detailed examination of the source of a city police officer's territorial jurisdiction. Consequently, their legal underpinnings are weak.[23] We find that the original construction of Article 999 by the Supreme Court in 1895, holding that city marshals have the same territorial jurisdiction as sheriffs, remains persuasive. Therefore, we hold that Articles 998 and 999 grant city marshals and city police officers county-wide jurisdiction to arrest offenders. To the extent that *Weeks*, supra, and its progeny conflict with this holding, they are overruled.

In the instant case, appellant was arrested within Harris County by a Tomball city police officer. Because Tomball is within

Harris County, Officer Toombs was properly operating within his jurisdiction.

We affirm the judgment of the Court of Appeals.

WHITE, J., concurs in result.

TEAGUE, J., dissents.

DUNCAN, J., joins in part III and dissents to part IV.

McCORMICK, Judge, concurring and dissenting.

Because I disagree totally with the content of Section III of the majority opinion, I must vigorously register my dissent. I find Section III to be objectionable for three reasons which I will set out below.

First, Section III is totally unnecessary to the resolution of the instant case. In Section III, the majority needlessly addresses the propriety of the State's claim of appellant's lack of standing. Clearly the majority is attempting to write an advisory opinion.[1] The merits of appellant's petition can be disposed of without an inquiry as to standing. Thus all of the language in Section III of the majority opinion is pure dicta and totally advisory. This Court has said time and time again that we will not issue advisory opinions. *Warren v. State*, 652 S.W.2d 779 (Tex.Cr.App.1983).

Secondly, standing is an inherent part of any inquiry pertaining to the Fourth Amendment. The majority categorizes the issue of standing as separate and distinct

to his home county. That holding obviously does not support the far different conclusion that a city police officer only has city-wide jurisdiction. As for the tertiary sources cited, they have no precedential value whatsoever.

**22.** No one in the majority has harbored even the slightest intention of casting aspersions upon the credentials or qualifications of those fine Judges participating in the *Weeks* and *Buse* decisions. Indeed it has been the intent of the majority to leave such pursuits to the judicial biographers, concentrating instead on objective and unempassioned legal analysis.

**23.** Indeed, in *Love*, the confusion which has resulted from these cases led the Court of Appeals to request "[g]uidance" from this Court or

the Legislature on the subject of a peace officer's jurisdiction. 687 S.W.2d at 478 n. 3.

**1.** *If it was essential to rule on the State's conten-*tion regarding standing, why did the majority not write on another contention raised for the first time in the State's response to appellant's petition, that is, that the officers acted properly in seizing the backhoe under Article 18.16 V.A.C.C.P., which permits any citizen to prevent the consequences of theft by seizing stolen property. Although this contention was procedurally equivalent to the standing contention, the majority ignored it. Could it be that the majority is attempting to "plant seeds" on the issue of standing in hopes that this dicta will be misinterpreted by some as authoritative in the future? I think the answer is obvious.

from the issue of whether a defendant's Fourth Amendment rights have been violated. In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court asked "whether it serves any useful analytical purpose to consider a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim." The Court answered the inquiry in the negative, concluding that "the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." The Court reiterated this holding in *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed. 2d 633 (1980). See also *Wilson v. State*, 692 S.W.2d 667 (Tex.Cr.App.1985) (Opinion on Rehearing). Since standing is "invariably intertwined" with the Fourth Amendment inquiry, the issue of standing does not have to be specifically "raised" by the prosecution. It is always part of the inquiry. Thus in an attempt to suppress evidence because of an alleged violation of his Fourth Amendment rights, the defendant bears the burden of proving not only that the search or seizure was illegal but also that he had a legitimate expectation of privacy in the area searched. *Rawlings v. Kentucky*, supra; *Rakas v. Illinois*, supra. This burden exists whether the government "raises" it or not. *Wilson v. State*, supra. Where, as in the instant case, the evidence clearly shows that the defendant was apprehended while driving a stolen vehicle, a lack of standing on the part of the defendant is affirmatively demonstrated. As a result, the defendant is automatically put on notice that standing is an issue in the case just as surely as if the prosecution had verbalized the issue. *Sullivan v. State*, 564 S.W.2d 698 (Tex.Cr.App.1978). Logically, then, the government is not barred from arguing the issue of standing for the first time on appeal. *Combs v. United States*, 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308 (1972) (per curiam); *Sullivan v. State*, supra. We would be remiss in our duties as appellate judges to ignore the defendant's failure to prove a legitimate expectation of privacy in such a situation simply because the issue of standing had not been "raised" by the Government in the trial court. To hold the search and seizure illegal when the record before this Court and the trial judge showed that the defendant had no standing to challenge the search would be totally absurd. *Sullivan v. State*, supra.

Certainly, the government is not allowed to advocate contradictory positions regarding the defendant's standing during the various stages of a case. This was the situation in *Steagald v. U.S.*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) cited by Judge Miller in his dissenting opinion in this case. Although *Steagald* is not on point with the instant case, it is helpful to review it in order to distinguish the case at bar. The sole issue before the Court in *Steagald* was whether the government, in its brief to the United States Supreme Court, could successfully argue that Steagald had no standing to contest the search of the house in which the contraband was found because he did not own it when it had been the government's position from the time of trial to the time of its brief contesting the grant of certiorari that Steagald owned the house. The holding in *Steagald*, which is clearly inapplicable to the case at bar, is that the government forgoes its right to contest standing at the appellate level when at earlier levels it has espoused the view that the defendant does in fact have standing.

Clearly, this is not the situation in the instant case. The State has never argued an inconsistent position. In its brief on original appeal, the State noted that during the hearing on the motion to suppress, the trial court ruled that all testimony regarding statements made by the appellant following his arrest would be excluded. It was the State's contention on original appeal that no other evidence seized as a result of the alleged illegal arrest was admitted into evidence at trial and thus even if the trial court was in error in overruling the motion to suppress, it was harmless. In its brief in response to the appellant's petition for discretionary review, the State

738

reurged the same argument and interposed for the first time, the question of standing:

"As a threshold matter, it appears that the Court of Appeals needlessly addressed the merits of the appellant's motion to suppress. The appellant's oral statements made at the time of his arrest *were* suppressed by the trial court, and his pretrial motions did not request suppression of any other particular evidence other than that '*seized* as a result of the arrest' [emphasis supplied], i.e., the stolen backhoe itself. But the appellant had no standing to complain of the inspection or seizure of the stolen backhoe, and the State offered no other items seized pursuant to his arrest." State's Brief in Response to Appellant's Petition for Discretionary Review, pp. 2–3.

Applying all of the above to the instant case, the evidence showed that appellant was driving a stolen tractor. It has been well-accepted by most jurisdictions, including Texas, that an occupant of a vehicle cannot be said to have standing by virtue of his presence if he is in possession of a stolen vehicle. *Vidaurri v. State*, 626 S.W.2d 749 (Tex.Cr.App.1981); *United States v. Kucinich*, 404 F.2d 262 (6th Cir.1968); *State v. Harding*, 137 Ariz. 278, 670 P.2d 383 (1983); *People v. Pearson*, 546 P.2d 1259 (Colo.1976); *Sanborn v. State*, 251 Ga. 169, 304 S.E.2d 377 (1983); *State v. McKinney*, 107 Idaho 180, 687 P.2d 570 (1984); *People v. Henenberg*, 55 Ind. 5, 302 N.E.2d 27 (1973); *State v. Rivers*, 420 So.2d 1128 (La.1982); *State v. Hamm*, 348 A.2d 268 (Me.1975); *Graham v. State*, 47 Md.App. 287, 421 A.2d 1385 (1980); *Burns v. State*, 438 So.2d 1347 (Miss.1983); *State v. Damico*, 513 S.W.2d 351 (Mo.1974); *State v. McFarland*, 195 Neb. 395, 238 N.W.2d 237 (1976); *State v. Ellis*, 88 N.M. 90, 537 P.2d 698 (1975); *State v. White*, 311 N.C. 238, 316 S.E.2d 42 (1984). Clearly, the affirmative evidence before us shows that appellant had no standing to contest the search and seizure of the tractor and the introduction into evidence of testimony regarding such at trial.

Finally, I believe the majority is in error when it asserts that different considerations apply when the issue of standing is raised for the first time on discretionary review. This Court is empowered to

"affirm the judgment of the court below, or may reverse and remand for a new trial, or may reverse and dismiss the case, or may reform and correct the judgment or may enter any other appropriate order, *as the law and nature of the case may require.*" Article 44.24, V.A.C.C.P. (emphasis added).

See also Article 44.25, V.A.C.C.P. This Court's powers of discretionary review are not limited to the words imprinted on the paper which the Courts of Appeals hand down. Rather, it is this Court's function to review the entire decision-making process as to each issue upon which we have granted discretionary review. This means we have the power and the responsibility to look behind the written words of the Courts of Appeal and review the rationale, the facts and the law underlying their decision.

In addition Tex.R.App.Proc. 90 provides that the Courts of Appeal must decide "every substantial issue raised and necessary to the disposition of the appeal." In accordance with the above discussion regarding standing, Rule 90 must be interpreted to mean that the Courts of Appeal should consider and rule on the standing issue in every Fourth Amendment claim. Thereafter, this Court is empowered to review the decisions of the Court of Appeals both as to the law and facts underlying the decision. See also Tex.R.App.Proc. 200(c)(5) (this Court may grant discretionary review "where the justices of the court of appeals have disagreed upon a material question of law necessary to its decision"). As Judge Clinton wrote in *Carter v. State*, 656 S.W.2d 468 (Tex.Cr.App.1993):

"There is a fundamental proposition pertaining to appellate functions of the Judicial Department: A constitutional grant of appellate jurisdiction treats a right of appeal in criminal cases 'as a remedy to revise the whole case upon the law and facts, as exhibited in the record,' *The Republic v. Smith*, Dallam, 407 (Tex.), quoted approvingly by the Supreme Court of Texas in *Bishop v. The*

*State*, 43 Tex. 390, 400 (1875)." 656 S.W.2d at 468.

Because the majority is attempting to curtail this Court's powers of discretionary review and because the issue of standing was properly presented for our review, I must register my dissent to that portion of the opinion. Otherwise, I concur in the result.

ONION, P.J., and W.C. DAVIS, J., join this opinion

CLINTON, Judge, dissenting.

Whether the construction given Articles 998 and 999, V.A.C.S., by the majority is correct is a moot point until it is determined that they are applicable to a Tomball police officer. That determination, in turn, depends upon the legal authority under which Tomball was organized and exists. But on that point the record is silent.

All this record shows is that the arrest of appellant was made by a "Police Officer with the City of Tomball," outside city limits. Nothing else informs us of the corporate status of Tomball and of any authority it has granted to its police officers.

By their very context and specific terms, Articles 998 and 999 are *not* applicable to every policeman and marshal in the State, and the broad assertion that "the Legislature has endowed" each such peace officer with the same jurisdiction, right, power and authority as a sheriff in his capacity as a conservator of the peace is not justified by the superficial examination of the matter made below, *Angel v. State*, 694 S.W.2d 164, 170 (Tex.App.—Houston [1st] 1985), nor by the majority opinion of this Court. In an appendix to this opinion there is a comprehensive survey of developing law regarding cities, towns and villages, taken primarily from Gammel's Laws of Texas (Gammel's). It demonstrates that all their peace officers do not have the same jurisdiction, rights, power and authority and that identifying the jurisdiction, rights, power and authority of a given peace officer requires more study than reading what

is thought to be an applicable statute, and may depend on a showing of many relevant matters. Yet, just such analysis is required by *Preston v. State*, 700 S.W.2d 227 (Tex.Cr.App.1985). One must first find the particular source of a grant and then ascertain what was delegated. It is evident that in *Newburn v. Durham*, 88 Tex. 288, 31 S.W. 195 (1895), perhaps because it was answering certified questions and was thus without any underlying facts, the Supreme Court was not sufficiently informed of facts implicating many provisions of law then extant, before coming to the conclusion upon which the majority now relies.

In the first place, when incorporated as a town Palestine provided for a "constable," as they were then called. Acts 1871, 12th Leg., 1st Sess., Ch. 117, p. 203, § 18, at 205; 6 *Gammel's* 1343.[1] There were certain amendments made in 1873, but Palestine remained a town. 7 *Gammel's* 1171. Gammel lists no more amendments made through 1902, but since in *1893*, B.A. Durham was a "town Marshal," *Newburn v. Durham*, 10 Tex.Civ.App. 655, 32 S.W. 112 (1895), we may assume that the mayor and aldermen decided to change the name of the office from constable to marshal, just as then article 534, R.C.S. 1879, had done. That is a small matter, however, because even under article 534, R.C.S. 1879 the marshal of a town had only "the same power within the town that constables [had] within their precincts." See Appendix, note 7. Meanwhile, the Legislature had provided for incorporation of an existing *city*, along with officers including a *city* marshal. Appendix, p. 5; 8 *Gammel's* 485, 494–495. B.A. Newburn was a *town* marshal, however. So in 1895, article 363, R.C.S. 1879 is not shown by the opinion to have any application to his office. *Newburn v. Durham*, supra, was thus wrongly decided, and the discussion of article 363 and its meaning is pure dicta.

The opinion in *Newburn v. Durham* is correct about the common law in one particular, *viz:* "*Independent of statute, the*

---

**1.** "That the constable, in addition to his powers and privileges as such, be and he is hereby vested with all the powers and privileges which are now, or may be by law, exercised by the constable of the beat in which said corporation is situated."

authority or jurisdiction of the marshal *would not extend beyond the city limits."* *Id.,* at 195.[2] Accord: *Weeks v. State,* 132 Tex.Cr.R. 524, 106 S.W.2d 275 (1937); *Minor v. State,* 153 Tex.Cr.R. 242, 219 S.W.2d 467, 470 (1949) (Hawkins dissenting). As shown in Appendix, for some forty years the people of Texas, first through the Congress of the Republic, then the Legislature of the State and in its cities, town and villages, uniformly accepted and implemented the common law. Not until 1895 did an appellate court suggest otherwise, and its decision has been cited only twice by judges of the Court: once in a leading opinion by a single judge and once by a dissenting judge—in the same case!—but not so much as alluded to by the third judge writing on rehearing. See *Minor,* supra.

In those circumstances to attach any significance to the fact "that the Legislature has met numerous times without amending Articles 998 or 999" to limit "jurisdiction" of city police officers to city limits is spurious. In 1895 a procedure for certifying questions to the Supreme Court was relatively new, having been included in an act to organize courts of civil appeals and to prescribe mode of procedure therein, Acts 1892, 22nd Leg., Ch. 15, p. 25, 31, § 35, 10 *Gammel's* 395, amended the following year by Acts 1893, 23rd Leg., Ch. 76, p. 100, 10 *Gammel's* 530. In providing for certification of "the very question to be decided" and that "during the pendency of the decision by the Supreme Court the cause in which the issue is raised shall be retained [by the court of civil appeals] for final adjudication in accordance with the decision of the Supreme Court upon the issue submitted," the Legislature deemed the latter decision to be no more than the "law of the case." That is precisely how the court of civil appeals treated the opinion of the Supreme Court on rehearing in *Newburn v. Durham,* 32 S.W., at 116.

Not until 1899 did the Legislature express concern about the fact that *"conflicts of opinions* on questions of *law* are now occurring"* with courts of civil appeals and

attempt to remove *such conflicts* through the certification procedure, declaring that an opinion of the Supreme Court "shall be final and shall be the law of the question involved, until said opinion shall have been overturned by the said Supreme Court, or abrogated by legislative enactment, and *the Courts of Civil Appeals shall be governed thereby."* Acts 1899, 26th Leg., Ch. 98, p. 170, 11 *Gammel's.* Of course, there was no conflict of opinions certified to the Supreme Court in *Newburn v. Durham,* so the Legislature was not obliged to act; needless to say this Court is not included among those courts "governed thereby."

The majority says that Article 998 and 999 combine to provide the statutory authority and jurisdiction, but it has made no visible effort to find any facts that show that they are applicable to Tomball; assuming they are, the majority finds it necessary to examine hypercritically and then overrule at least four decisions of the Court contrary to its construction of Article 999 in order to give vitality to an incorrect interpretation in *Newburn v. Durham,* supra.

To say that in *Weeks v. State,* 132 Tex. Cr.R. 524, 106 S.W.2d 275 (1937), the Court "provided a gratuitous discussion" of jurisdiction of police officers is to misread the opinion. Cleburne police officers received a radio call to look for a red car going in a certain direction on a particular street; upon spotting such a car they followed it and saw in it what they thought were several cartons of beer. They continued to follow the car beyond corporate limits and stopped it, searched it, found much whisky and beer, arrested appellant, seized the contraband and turned it over to the sheriff. Appellant objected to their testimony on several grounds, one of which was *"that the arrest by said policemen beyond the corporate limits of said city and the search of her car was illegal."* *Id.,* 106 S.W.2d at 275.

Addressing the issues thus raised the Court first pointed out an indisputable proposition, *viz:*

---

2. All emphasis is mine throughout unless other-    wise indicated.

"Under the common law a policeman's authority is confined to the limits of the city unless such authority is *extended by legislative act.*"

Accord: *Newburn v. Durham*, supra. It then set out verbatim Articles 212 and 213, C.C.P. 1925, providing authority to arrest in prescribed circumstances, and a section of an article in the Texas Liquor Control Act, declaring it the duty of a peace officer who discovers a person in the act of unlawfully transporting liquor to seize the liquor. The Court found none of those articles authorized a city policeman, though a peace officer, *to arrest without a warrant* one transporting liquor, since unlawful transportation of liquor was no longer a felony nor an offense against the public peace, unless by virtue of the quoted section 44 of the liquor law; however, nothing therein conferred such authority, and except the Court by implication extended the meaning of that statute, "no such authority exists."

"In view of articles 212 and 213, C.C.P., we must assume that the Legislature, when it enacted section 44 of Article 1 of the Texas Liquor Control Act, took cognizance of said articles which are a limitation upon the legal authority of peace officers. If the Legislature desired to extend the authority therein granted, they would have said so. Not having done so, the presumption prevails that they did not intend to do so, and, therefore, we would not be authorized by implication to extend it. Article 999, R.C.S. 1925, seems to limit the legal authority of peace officers to their own bailiwick. *In considering the foregoing articles of the statute together and giving effect to each,* it occurs to us that the policemen of the city of Cleburne exceeded their legal authority in making the *arrest* of the appellant *without a warrant* and in making the *search beyond the corporate limits* of said city. Therefore the testimony showing what the policemen found as a result of the search was inadmissible as evidence against her."

*Id.,* 106 S.W.2d at 276.

It would later be said in *Minor v. State,* 153 Tex.Cr.R. 242, 219 S.W.2d 467 (1949), that this opinion "makes the statement that the authority to *arrest* terminated at the city's boundary," *id.,* at 471. I have not found such statement, nor is that my reading of the opinion: having searched for and found no statutory authority for a peace officer to make a warrantless arrest for unlawful transportation of liquor, the Court was unwilling to extend section 44 to authorize that; thus, the warrantless arrest was in excess of authority. *And* so was the search because *it* was made beyond the city limits. In any event, the Court was ruling directly on one contention made by Weeks; its statements were far from "gratuitous."

Moreover, the Court should not be faulted for failing "[to] discuss the precedential value of *Newburn,* supra," since at that time the decision had not even been cited by any other appellate court in this State, and the Court was not governed by it anyway. And just because the opinion fails to discuss "the effect of the 'power, authority and jurisdiction clause' in Article 999, supra," does not mean that the judges failed to consider it. Indeed, the opinion makes manifest they did.

Although the majority skips over it, next in order of delivery is *Irwin v. State,* 147 Tex.Cr.R. 6, 177 S.W.2d 970 (1944). Search warrants addressed to "Sheriff or any Constable of Harris County" were executed at the home and automobile of Irwin located outside the City of Houston by police officers of the City of Houston, including two who claimed to be acting under authority of a commission as a special deputy sheriff of Harris County. They seized materials used in operating a policy game. The return was made in the name of the Chief of Police of the City of Houston by two deputy policemen of the City of Houston. Objections to admitting testimony of searches and seizure outside the city included that the officers were not authorized by law to make them. Irwin contended that the two officers holding special commissions could not constitutionally be both policemen of the City of Houston and special deputies sheriff. *The State did not contend Houston police officers were authorized to act outside the city.* Rather, it asserted that

if they were not deputies sheriff de jure, that were such officers de facto and as such their acts were binding on Irwin and the public and were not subject to collateral attack. *Id.*, 177 S.W.2d at 971–972.

Addressing the constitutional issue, the Court found that "the named officers could not at the same time be both policemen and deputies sheriff de jure or de facto." *Id.*, at 973. The significance of the latter status was explained by the Court, *viz:*

"In order for the searches to be legal, Officers Eubanks and Martindale, or either of them, were required to be deputies sheriff, because they could not have executed the warrants or made the searches thereunder, as policemen, outside the limits of the City of Houston, *their territorial jurisdiction as policemen being restricted to the confines of that city.* [Citing *inter alia Weeks v. State,* supra]."

*Id.*, at 973. Finding they were not deputies sheriff de facto and that "their purported acts as such were without authority of law," the Court concluded that the search of Irwin's residence was illegal. *Id.*, at 974.

As to the search of his automobile, while the Court did not discuss it under the purported warrant because it found that a search of an automobile for gambling instruments was permissible without a warrant, it refused to uphold the search, *viz:*

"However, the search of the automobile in the instant case cannot be justified as being a search upon probable cause, because of *the lack of territorial jurisdiction of the officers making the search,* as we have heretofore pointed out. *Henson v. State,* 120 Tex.Cr.R. 176, 49 S.W. 2d 463."

*Id.*, 177 S.W.2d at 975.

The gambit used by the majority to attack holdings of both *Weeks* and *Irwin* is

to show that in *Minor v. State,* 152 Tex.Cr. R. 242, 219 S.W.2d 467 (1949), the Court "criticized part of its own holding in *Weeks*" and since *Irwin* cited *Weeks* "the precedential value of *Irwin* must be questioned." Majority opinion, at p. 735.[3] However, the *Minor* court never questions *Irwin.*

The holding of the lead opinion is not the "doctrine" laid down by the Supreme Court in *Newman.* Rather, it is founded in the doctrine of "hot pursuit." See *id.,* 219 S.W.2d at 469, 470. The opinion itself sets out the question and later answers it, *viz:*

"The crucial point herein is, Did the arresting peace officers, being policemen, have *authority* to finally complete the arrest at a point where the fleeing parties had passed out of the city and over its boundary, or, in other words, does the ancient ecclesiastical doctrine of sanctuary apply to such actions on their part? [S.W. at 469]

\*     \*     \*     \*     \*     \*

What we are holding herein is that where a police officer has the *right* to arrest without warrant for an offense committed *within the confines of his city* and initiates a pursuit of the malefactor, being in immediate pursuit, he can continue such pursuit, although such continuance leads him outside the corporate limits of the city, if necessary, his *rights* being the same as those of the sheriff *in such event.*

Therefore, we hold that the peace officer had the same *power* as the sheriff relative to his jurisdiction and could carry out *his intended arrest of a person whom he was directly pursuing* for an infraction of the law in such officer's presence."

**3.** It also notes that "the Court quoted approvingly from *Newburn.*" That quote was in the lead opinion of only one judge; the concurrence expressly disagrees with the implication in the lead opinion that a city policeman has authority equal with a sheriff to county lines, thereby rejecting *Newburn;* the dissent is "doubtful about this construction," and distinguishes *Newburn id.,* 219 S.W.2d at 470–471. In its opinion

on rehearing the Court completely ignores *Newburn,* content to say that "the original opinion properly decided the case," so it is "immaterial that the different judges of the Court did not agree on all the language used...." *Id.,* at 472. Hardly an endorsement of *Newburn,* its opinion still has not been followed by the Court—until today.

*Id.,* at 470.[4]  The concurring opinion could not "subscribe to the implication that a city policeman has authority equal to that of the sheriff co-extensive with the bounds of the county."  But Judge Beauchamp did agree that he has "a right to continue the pursuit regardless of county lines...."  Still, he opined:

> "The statute giving the policeman a right similar to that of the sheriff must be *limited to the confines of the city boundary lines.*  He cannot go beyond the city limits *to initiate an arrest.*"

*Id.,* at 470.  In dissent, Presiding Judge Hawkins called attention to a general rule that peace officers have no "official power" to apprehend offenders beyond their venue, citing, e.g., *Irwin,* remained "doubtful" about "legality of an arrest consummated beyond the city limits," and called on the Legislature to "clear up" the matter.  *Id.,* at 471.

Therefore, however the lead opinion regarded *Newburn v. Durham* is beside the point, for clearly the other two judges expressly disavowed its "doctrine."

On rehearing Judge Beauchamp, who had concurred because the policemen had a right to make an arrest within the city and "pursued this right" to arrest outside the city, confronted a contention by Minor that the right of the policemen to arrest without a warrant terminated at the city limits, relying on *Weeks,* supra.  The majority here correctly says that his opinion "criticized" a part of the *Weeks* holding, but what the majority sets out in its opinion at page 735, bracketed below, does not demonstrate the basis for and consequence of his criticism, *viz:*

> "[The opinion (in *Weeks*).... makes the statement that the authority to make the arrest terminated at the city's boundary line.  This general statement was not necessary to a decision of the case.  We think it was an erroneous statement and should not be followed.]  The officers

*never had a right to arrest Mrs. Weeks without a warrant within the city,* under the information which led them to pursue her.  The opinion should have so stated and it would necessarily have followed that *they had no right to do so beyond the city limits.*"

*Id.,* at 471.  While I believe its criticism is misplaced, see *ante* at p. 741, that treatment of *Weeks* clearly accepts the general proposition that territorial jurisdiction of city policemen is restricted to confines of his city; it goes on to explain that in order to make a valid warrantless arrest outside his city a policemen must have had a right to arrest for an offense committed within the city and then pursued the offender beyond limits of the city to effectuate an arrest.  Indeed the exception, as they say, proves the rule.

Returning to the motion for rehearing, Judge Beauchamp notes that in discussing article 37, C.C.P. (now 2.13), the motion called attention to the fact that it makes it "the duty of a policeman to 'preserve the peace within his jurisdiction.'"  He points out that "is in accord with the statement made in the original opinion and the concurring opinion," and reiterates the idea that because they had the right to arrest Minor within the city they also were entitled to pursue him beyond city limits "to do that thing they are charged with the duty of doing."  *Id.,* 471–472.  Again, the majority on rehearing at this point does not rely on *Newman,* but the opinion does resort to Article 999, *viz:*

> "Article 999 of the Revised Civil Statutes, in defining the territorial jurisdiction of a city marshal, may be further relied upon as authority for the policemen in the instant cause, *because appellant was 'offending against the peace of the city.'*  As distinguished from the Weeks case, the act of the police in *beginning the pursuit* was lawful....  We cannot agree with the contention in

---

**4.**  Because of its determination to have "jurisdiction" mean what it wants the word to mean, I call to the attention of the majority that in the critical parts of the opinion by which it puts much store Judge Graves writes in terms of "authority," "rights" and "power" of the pursu-

ing city policeman.  If Judge Graves really believed *Newburn v. Dunham* controlled, he would have said so, instead of going through a lengthy exercise to reach twin holdings quoted above that are not the "doctrine" of and do not there cite *Newburn.*

the motion that no part of the arrest took place within the city. The pursuit, continued beyond the bounds of the city, resulted in taking appellant into custody and all of their acts *from the time the pursuit began* until they had custody of their prisoner constitute part and parcel of the act of arrest. It did *begin in the city* and extended beyond it."

*Id.*, at 472. Whether one agrees with that stated rationale is irrelevant. The points are that on rehearing the Court never mentioned the language in Article 999 that the majority here insists gives a city policeman the same territorial jurisdiction as a sheriff, and the Court did not rely on *Newburn v. Durham.*

The plain implication of the conclusions reached is that authority of a city policeman to make a warrantless arrest of one "offending against the peace of the city" is limited to the territorial boundaries of his city *except* when that one flees beyond the limits of the city to avoid arrest. *Minor* merely extends the "hot pursuit" doctrine into areas outside city limits.

The majority also applies what it still calls the "rejection" of *Weeks* to question the precedential value of *Buse v. State,* 435 S.W.2d 530 (Tex.Cr.App.1968), in that it relied on *Irwin:* "However, given the earlier rejection of *Weeks,* which was the foundation of *Irwin,* the precedential value of *Buse* must be questioned." Majority opinion, p. 736. As already indicated, to say that *Weeks* was "rejected" is not a fair interpretation of the opinion on rehearing in *Minor.* Nor is *Weeks* the "foundation" of *Irwin.* While the majority opinion is disdainful of early decisions of the Court, e.g., those cited in note 20 of its opinion, back then the starting point in nearly all such situations was the common law, and the authority usually cited is 2 Ruling Case Law 469, § 27. See *Henson v. State,* 120 Tex.Cr.R. 176, 49 S.W.2d 463 (1932); *Weeks v. State,*

supra; *Irwin v. State,* supra, 177 S.W.2d at 973; *Minor v. State,* supra, 219 S.W.2d at 470 (Hawkins dissenting). Some of the cases dealt with sheriffs, and the majority dismisses them on that account. However, the common law rule applied equally to *any* "public officer appointed as a conservator of the peace for a particular county or municipality" to deny him "official power to apprehend offenders beyond the boundaries of the county or district for which he has been appointed." *Henson,* 49 S.W.2d at 465. Thus the "foundation" of practically everything written on this matter is the common law, and the judicial inquiry is whether the common law has been modified and extended by statute. *Henson, Weeks,* et al.

By the time *Buse v. State,* supra, came before the Court the precedents had more or less incorporated and applied the common law, making its decisions themselves authoritative. In *Buse,* the Court had only to review them and follow pertinent authority. That is precisely what it did: *Irwin* was followed and *Minor* was distinguished. *Buse,* 435 S.W.2d at 532.

Finally, the majority would have it that in *Weeks* and other decisions surveyed the Court "did not undertake a detailed examination of the source of a city police officer's territorial jurisdiction," so "their legal underpinnings are weak." But the main underpinning is common law, and the rule has always been stated in a single sentence. *Newburn, Weeks, Irwin* and *Minor* (Hawkins dissenting). The only other underpinning possible would be a legislative act extending authority, power, right or jurisdiction of a police officer beyond limits of his city. *Weeks* looked at relevant legislative acts, including Article 999, and said, "We find no extension here." [5]

The opinion in *Irwin* cited, e.g., *Weeks* for the proposition that for purposes of executing search warrants and making

---

**5.** The *Weeks* court composed of Presiding Judge Wright C. Morrow, Judge Offa S. Lattimore and Judge Frank Lee Hawkins. For impressive credentials of Presiding Judge Morrow and Judge Lattimore, see *Almanza v. State,* 686 S.W.2d 157, 166, 171, n. 12 (Tex.Cr.App.1985); Judge Hawkins joined them on the Court February 8,

1921. Together they worked through the aftermath of *Welchek v. State,* writing scores of opinions on the law of arrest and search and seizure. See *Brown v. State,* 657 S.W.2d 797, 802–806 (Tex.Cr.App.1983). They are the Judges who approved the opinion written by Commissioner Krueger in *Weeks.*

searches outside the limits of the City of Houston, "territorial jurisdiction as policemen [was] restricted to the confines of that city." *Irwin*, 177 S.W.2d at 973. Commissioner Davidson, having been the sole representative of the State in that cause, surely well understood that *Weeks* so held with respect to searches without a warrant; when the Judges examined his opinion and the Court unanimously approved it, Presiding Judge Hawkins, having been the third Judge in *Weeks*, certainly would be expected to approve it—as did Judges Harry N. Graves and Tom L. Beauchamp. In *Minor*, through separate opinions Judge Graves, Judge Beauchamp and Presiding Judge Hawkins again probed all germane aspects of the problem, including Article 999, *Newburn v. Durham*, "hot pursuit," the general rule stated in Ruling Case Law, prior decisions of the Court in *Henson, Weeks* and *Irwin*, all supra; a majority of the Court ultimately adopted a "hot pursuit" rule rather than "the original construction of Article 999 by the Supreme Court [in *Newburn*] in 1895." By 1968 the Court had five Judges, none of whom had participated in the prior decisions; in *Buse* a unanimous Court, including Presiding Judge Onion, former Presiding Judge K.K. Woodley, the late W.A. Morrison, and the late Leon Douglas, followed *Irwin* to hold that "the arrest and search of appellant [in the city of Bellaire] by [two Houston] city officers outside the jurisdictional limits of the city of Houston was unlawful." *Id.*, 435 S.W.2d at 532.

Given that decisions of the Court from *Weeks* to *Buse* represent more than thirty years of *stare decisis*, supported by hundreds of years of common law, the majority should provide more justification than merely saying a 1895 opinion of the Supreme Court in a civil case—*one that has never been followed by the Court of Criminal Appeals or any other appellate court in this State*—"remains persuasive."

I dissent.

TEAGUE, J., joins.

1. All emphasis is mine throughout unless other-

APPENDIX

Early on towns and cities were incorporated by special acts of the Congress of the Republic of Texas, often several in a single enactment. The mayor, aldermen and principal officers, ordinarily including a marshal, were elected. Although certain duties were mandated, e.g., "from time to time to pass such rules and ordinances for the regulation of the police and preservation of order, *within the corporation limits as may be necessary....*," essentially they were selfgoverning, admonished however that their rules and ordinances "shall not be contrary to the constitution and laws of this republic."[1] See, e.g., Acts of June 5, 1837 and of December 29, 1837; 1 Gammel's Laws of Texas (Gammel's) 1298 and 1459, incorporating among others the city of Houston.

Then the Legislature began to incorporate a town or city by specific enactment, such as Acts 1846, 1st Leg. p. 285, 2 *Gammel's* 1591, declaring the city of Austin "a body politic and corporate, by the name and title of the 'Corporation of the City of Austin.'" Along with other officers, including a mayor and recorder to hold court, the marshal continued to be elected; the city council was given more particularized power and direction to pass by-laws and ordinances; the marshal and his deputies were enjoined "to act as police officers, *to preserve the quiet of the city*, and to inform the mayor or recorder of all breaches committed against *city ordinances*." *Id.*, §§ 4, 7 and 19.

In time, charters of incorporation "continued to grow in length and the powers of the city governing board were spelled out in greater detail," Interpretive Commentary following Article XI, § 4. See, e.g., "An Act to incorporate the City of San Antonio," Acts 1856, 6th Leg. Special Laws, Ch. 86, p. 4; 4 *Gammel's* 550.

While it was incorporating by special laws, the Legislature also provided for incorporation of towns and cities in Acts 1858, 7th Legislature, Ch. 61, p. 69, §§ 1 and 36, respectively. 4 *Gammel's* 941 ff.

wise indicated.

Voters of an incorporated town elected a Constable, § 10, who "shall have the same power *within the town* as other Constables have within their precincts," § 30. Voters of an incorporated city elected a city Marshal, § 38, who, as well as "the rights, powers and duties prescribed.... to *town Constables*," had "such rights, powers [and] duties as shall be prescribed by.... the City Council, not inconsistent with the laws of this State," § 41. Despite such enabling legislation "probably few" cities and towns took advantage of it for charters continued to be granted by special laws. Interpretive Commentary, supra.[2] Moreover, during Reconstruction elective city and town governments were abolished in favor of the governor's appointing mayor and aldermen; not until 1873 did the Legislature repeal the law granting that power, and restore the original elective forms of government. *Ibid.* Also, the Legislature amended the basic Act of 1858, with respect to towns, primarily lowering the number of "free white inhabitants" from three hundred to "two hundred souls" and altering the scheme for incorporating and manner of elections. Acts 1873, 13th Leg., Ch. 65, p. 98; 7 *Gammel's* 550.[3]

Nevertheless, many cities and towns were again incorporated under a new charter, and apparently the Legislature left to local option a statement of powers and duties of a marshal or constable. See charters of named cities and towns in index to

Special Laws enacted by the 13th Legislature in 1873. 7 *Gammel's* 1521–1522; see also index to Special Laws of the Twelfth Legislature in 1871. 6 *Gammel's* 1689–1650.

Austin, for example, was incorporated with a charter that was rather elaborate in many respects, Acts 1873, 13th Leg., Ch. 65, p. 215; 7 *Gammel's* 915; but in pertinent part Article IX, § 1 merely provides: "The city marshal shall, *within the city*, possess the same powers, perform the same duties, and receive the same compensation, as a constable of Travis county." *Id.*, at 224, 7 *Gammel's* 924. On the other hand, drafting from a common formulation much like that of article 809, reproduced in the Historical Note to Article 999, some cities expressed an understanding as to whether the marshal was restricted to city limits.[4] Others did not have a marshal at all, leaving such duties and functions to the mayor (as in Lampasas, Acts 1873, 13th Leg., Ch. 40, p. 288, at 290, § 5, 7 *Gammel's* 990), or to a chief of police (Corpus Christi, Act 1873, 13th Leg., Ch. 193, p. 493, at 521, § 77, 7 *Gammel's* 1221). In short, law enforcement was a matter for each specially chartered city and town to fashion according to its own lights—so long as it did not offend the Constitution and laws.

The direct progenitor of Article 999, supra, is in Acts 1875, 14th Leg., 2d. Sess.,

**2.** Thus whether by a special law or general incorporation, we come to understand why Article 44, C.C.P. 1879 listed "constable" twice as peace officers: "The sheriff and his deputies, constable, the marshal, constable or policeman of an incorporated town or city...."

**3.** Later it would authorize towns and villages previously incorporated by the Congress of the Republic or the Legislature of the State by resolution of aldermen and vote of the people to amend their charters "in any particular not in conflict with the constitution of the State or the Revised Statutes." Acts 1881, 17th Leg., Ch. 77, p. 83, 9 *Gammel's* 175.

**4.** Thus San Antonio provided that its city marshal *inter alia* "shall have powers, and execute like power, authority and jurisdiction as the sheriff of a county, under the laws of the State, within the city limits." Acts 1870, 12th Leg., Ch. 123, p. 244, § 131, at 263; 6 *Gammel's* 781; similarly, El Paso provided, he shall have pow-

ers, and execute like powers, authority and jurisdiction, as the sheriff of a county under the law of the State within the city limits, Acts 1873, 13th Leg., Ch. 181, p. 438, § 101, at 457; 7 *Gammel's* 1157; Columbus provided that "the duties and powers of [its] marshal shall be coextensive with the limits of said city, and similar to those of the sheriff or constables of [Colorado County], but also granted him" power to go beyond the limits of the city to arrest offenders against the law or ordinances of the city or State, Act 1873, 13th Leg, Ch. 57, p. 906, § 12, at 910; 7 *Gammel's* 910; Fort Worth authorized its marshal to execute process "anywhere," but "only for offenses committed within [its] corporate limits," and granted its police force "the right, in the city limits, to arrest without a warrant, for offenses against the penal ordinances of the city." Acts, 1873, 13th Leg., Ch. 7, p. 47, at 71; 7 *Gammel's* 771.

Ch. 100, p. 113, § 20, at pp. 122–123; 8 *Gammel's* 485, at 494–495. This act regulated incorporation of cities of one thousand or more inhabitants that accepted its provisions, in lieu of any existing charter, in the manner required by § 1; several articles were amended by Acts 1881, 17th Leg., Ch. 103, p. 115; 9 *Gammel's* 207. Section 157 conditioned its application to any city upon "acceptance by the city council of such in accordance with the provisions of section one of this act." Called "marshal of the city," germane portions of § 20, supra, are quoted and underscored for context and flow of statements prescribing one's functions, *viz:*

" * * * He shall be active in quelling riots, disorder and disturbances of the peace within the limits of said city, and shall take into custody all persons so offending against the peace of the city, and shall have authority to take suitable and sufficient bail for the appearance before [city] courts, of any person charged with an offense against the ordinances or laws of the city. It shall be his duty to arrest without a warrant all violators of the public peace and all who obstruct or interfere with him in the execution of the duties of his office, or who shall be guilty of disorderly conduct or disturbances whatever. To prevent a breach of the peace or preserve quiet and good order, he shall have authority to close any theatre, bar room, ball room, drinking house, or any other place or building of public resort; and in the prevention and suppression of crime and arrest of offenders he shall have, possess

and execute like power, authority and jurisdiction as the sheriff of a county under the laws of the State..... The marshal shall give such bond for the faithful performance of his duties as the city council may require, and he shall perform such other duties and possess such other powers, rights and authority as the city council may by ordinance require and confer, not inconsistent with the Constitution and laws of this State."

That is the article that was construed by the Supreme Court in *Newburn v. Durham*, 88 Tex. 288, 31 S.W. 195 (1895).[5]

Article 998 is rooted in Acts 1907, 30th Leg., Ch. 156, p. 299, 13 *Gammel's*. At the time Title 18 of the Revised Civil Statutes of 1895 was entitled "Cities and Towns;" it contained Chapters 1–10, relating to cities, that were followings of Chapter C, Acts 1875, supra, and Chapter 11, relating to towns and villages, the precursor of which is the Act approved January 27, 1858, 4 *Gammel's* 941, discussed *ante*, at pp. 745 –746.[6]

Section 1 of the 1907 Act amended Title 18, Chapter 4, by adding article 483b, R.C.S. 1895, providing in pertinent part:

"The city council or town council of any city or town.... *incorporated under the provisions of this title*, may provide for the appointment ... of such police officer, or officers, as may by such city council be deemed necessary.... Such police officer or officers so appointed.... shall give such bond for the faithful performance of his duties as the city council may require and such police offi-

5. When codified, § 20 became article 363, R.C.S. 1879; then article 407, R.C.S. 1895; article 808, R.C.S. 1911; finally Article 999, R.C.S. 1925. By Acts 1901, 27th Leg., Ch. 122, p. 291, Article 407 was amended to provide for council approval of appointment of deputies; otherwise it remained as originally enacted. See 11 *Gammel's*. In 1895 the Legislature provided that cities and towns with fewer than three thousand inhabitants may dispense with a marshal on grounds that the office was "unnecessary and expensive." Acts 1895, 24th Leg., Ch. 41, p. 49; 10 *Gammel's* 779. That Act was codified as article 483a, R.C.S. 1895; soon the Legislature partially recanted, and by Acts 1903, 28th Leg., ch. 87, p. 114, § 1; 12 *Gammel's*, it amended the act to provide that if the office of marshal be

abolished the same ordinance may confer its duties upon "any peace officer of the county;" as thus amended it became article 809a, R.C.S. 1911. See *Alexander v. City of Lampasas*, 275 S.W. 614 (Tex.Civ.App.—Austin 1925), no writ history. Article 999 has a similar provision. Since 1949, however, Article 999a, V.A.C.S., has provided that the office may be abolished in cities and towns with fewer than five thousand inhabitants by ordinance conferring its duties upon a city police officer.

6. In R.C.S. 1911, the title was renumbered 22; presently it is Title 28, and contains many chapters added since 1895.

cer or officers ... shall have powers, rights and authority as are by said title vested in city marshalls [sic]." [7]

Again, none of the statutory provisions of the 1875 Act and its successors "apply to any [incorporated] city, town or village until such provisions have have been accepted by the council in accordance with [the requirements of its § 1]," now Article 961. That, of course, includes Articles 998 and 999. After the Constitution of 1876 provided in Article XI, § 4 that certain cities and town "may be chartered alone by general law," the Legislature enacted Acts 1881, 17th Leg., Ch. 58, p. 63; 9 *Gammel's* 155, to prescribe means and manner of a town or village and a city or town to be incorporated. See now Article 1133 and 966, respectively.[8]

In 1909 the Constitution was amended to provide that cities and towns under five thousand population "may be chartered alone by general law." Article XI, § 4, and Historical Note following. Adopted in 1876 to apply to cities of more than ten thousand inhabitants, Article XI, § 5 was also amended in 1909 to reduce to more than five thousand the population of cities whose charters may be granted or amended by special legislative acts; however, in 1912 § 5 was again amended to omit those provisions relating to special legislative acts, and to provide instead that such cities may adopt or amend charters converting to home rule form of government, subject to such limitations as may be prescribed by the Legislature. See Historical Note following § 5.

Initially enacted in 1913, the latter are generally prescribed in Chapter Thirteen, Title 28, Article 1165 et seq., V.A.C.S. *Inter alia*, the 1913 Act assured in what is now Article 1177: "All powers heretofore granted any city by general law or special char-

ter are hereby preserved to each of said cities, and the power so conferred.... is hereby granted to such cities when embraced in and made a part of the charter adopted by such city; and until the charter of such city as the same now exists is amended and adopted, it shall be and remain in full force and effect." See *Board of Equalization v. McDonald*, 133 Tex. 521, 129 S.W.2d 1137, 1141 (1939). The advent of home rule government marks the last creation of any significant class of municipal government.

MILLER, Judge, dissenting.

I concur in the result reached concerning the standing issue raised by the State for the first time (in this appeal) before this Court. My concurrence is based on my original opinion in *Wilson v. State*, 692 S.W.2d 661 (Tex.Cr.App.1984), however, and not on any interpretation of whether a "decision" of a court of appeals (as used in Texas Rule of Appellate Procedure 200) means only the bottom line of one of their opinions, only the reasoning used by the court in a particular case, or only a reason brought forth by one side or another in briefs, etc. Such squabbles are more appropriately addressed by the Rules of Appellate Procedure promulgated by this Court itself. Let us not forget that we write these rules, and if there is some ambiguity therein, or if they are subject to different interpretations, the appropriate place to settle our differences is *in* the rules.

In *Wilson*, supra, we said on original submission, quoting *Steagald v. U.S.*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981):

"The Government, however, may lose its right to raise factual issues of this sort

---

7. To be recalled is that a town constable had the same power within the town as other constables possessed in their precincts, see *ante*, at page 745–746; somewhere along the way (probably in the 1879 revising process) the title was changed to marshal, and so appears in article 534, R.C.S. 1879; article 607, R.C.S. 1895; article 1056, R.C.S. 1911. As in Article 1147, R.C.S. 1925, he is still a marshal with the same power within a town that constables have in their precincts.

8. Remembering the Republic of Texas had incorporated cities, towns and villages, the Legislature provided in Acts 1917, 35th Leg., Ch. 48, p. 85, they were authorized to accept the first ten chapters of the title in the manner therein prescribed. See now Articles 967, 968, 969 and 970.

[reasonable expectation of privacy] before this Court [1] when it has made contrary assertions in the courts below, [2] when it has acquiesced in contrary findings by those courts, [3] **or when it has failed to raise such questions in a timely fashion during litigation.**" *Id.* at 209, 101 S.Ct. at 1646. (emphasis and brackets added).

*Wilson*, supra at 663. I still adhere to that view.[F]

I dissent to the jurisdiction holding. In interpreting legislative intent here we should be more guided by Chapter 311 of the Government Code, titled Code Construction Act. The tortured and maze-like meanderings of the majority opinion over the particular meaning of "jurisdiction" are hardly convincing for the proposition that the Legislature intended the word to be used in the sense that the majority wishes. The Legislature most recently enacted these statutes in 1875 and 1907 and amended them in 1967 and 1969. It is just as likely that the term "jurisdiction" was here intended to mean the levels of criminal offenses that a police officer could enforce (felony, misdemeanor, class "C" misdemeanor, offenses outside the Penal Code, etc.). Else the very wording of Art. 14.01, V.A.C.C.P. paragraphs (a) and (b) is redundant:

> (a) A peace officer or any other person, may, without a warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony or as an offense against the public peace.

> (b) A peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view.

Our prior caselaw is correct. For a felony or breach of the peace a police officer or any citizen can arrest *anywhere;* for other crimes committed in his presence a police officer had better be seeing them happen in "his own bailiwick." *Weeks v. State,* 132 Tex.Cr.R. 524, 106 S.W.2d 275, 276 (1937).

Where the legislative intent is so unclear, and when the reasoning has to be this circuitous, we can hardly say we are determining legislative intent. We are in fact ourselves legislating.

I dissent.

---

**F.** Curiously, Judge McCormick in his concurring and dissenting opinion seems to limit the holding in *Steagald* to only the first method by which the government may lose its right to raise an issue on appeal. Only if one ignores method # 3, above, is *Steagald* "clearly inapplicable" as Judge McCormick maintains.