# UNITED STATES

### v.

## Patrick GARNER.

## Criminal Action No. 7:95–CR–4–X.

United States District Court,
N.D. Texas,
Wichita Falls Division.

Oct. 31, 1996.

---

■■■■■■■■■■■■■■■■■

Madeline Johnson, Asst. U.S. Atty., for plaintiff.

Peter Lesser, for defendant.

## MEMORANDUM OPINION AND ORDER

KENDALL, District Judge.

Now before the Court is the Defendant Patrick Garner's Motion to Suppress Evidence filed on November 24, 1995. An evidentiary hearing, briefing and oral argument were performed in this matter. This case raises substantial questions, issues and policy considerations of "federalism[1]" and the role of the federal judiciary in presiding over cases investigated and filed by state law enforcement officers which historically have been and should be prosecuted in state courts under state law, even where a federal statute creates concurrent federal jurisdiction[2]. Despite this Court's concern with the ever-burgeoning federal criminal docket and the practical effect of encouraging state law enforcement officials to run to the federal courts when their actions have violated a state, but not the federal constitution[3], this Court has no choice but to follow prevailing Fifth Circuit law. Accordingly, after careful consideration of the motion, the filed materials and the applicable law, the Court determines that the motion must be, and is hereby, **DENIED.**

### I. Factual Background

The Court enters the following findings of fact. The findings of fact are based upon the evidentiary hearing the Court held and the submissions of the parties.

On January 18, 1994, at approximately 10:00 a.m., Troopers Potts and Hooper of the Texas Department of Public Safety ("DPS") received a call of a subject passed out in a Ford pickup with the motor running on Texas Highway 16, seven miles south of Graham, Young County, Texas. The troopers proceeded to the location indicated in the call. Upon arrival at the scene, the troopers observed Patrick Garner standing at the rear of the pickup urinating.[4] The troopers stopped their vehicle and Trooper Potts approached the defendant. Trooper Potts asked the defendant if everything was OK. After Garner replied he had just stopped to take a nap,

---

1. *See generally* THE FEDERALIST No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961).

2. *See generally* Symposium: *Federalism and the Criminal Justice System,* 98 W.VA.L.REV. 757 (1996); *See* John B. Oakley, *The Myth of Cost-Free Jurisdictional Reallocation,* 543 ANNALS AM. ACAD.POL & SOC.SCI., 52, 62–63 (1996) (arguing for substantial federal assistance to state courts to allow them to combat crime more successfully, as an antidote to increasing federal criminal jurisdiction); Gerald G. Ashdown, *Federalism, Federalization, and the Politics of Crime,* 98 W.VA. L.REV. 789 (1996); *see also* H. Scott Wallace, *Compulsive Disorder: Stop Me Before I Federalize Again,* 28–JUN PROSECUTOR 21 (1994).

3. Though not in view in this case, a like concern is prosecution of historic state cases in federal court because a selected defendant will almost always receive harsher punishment under the federal sentencing guidelines.

4. Urinating in public constitutes disorderly conduct; a Class C misdemeanor under TX PENAL CODE § 42.01.

Trooper Potts asked him for some identification. Garner produced two Texas Driver's licenses; one of the licenses had been altered by cutting off the picture[5].

The trooper observed that Garner seemed disoriented and confused and asked Garner how much sleep he had gotten during the night. After Garner replied that he had gone to bed about midnight and gotten up about 7:30 a.m., Trooper Potts read Garner his rights and asked if he had any contraband or weapons in the car. Garner replied that he did not and that the troopers could look. Potts asked Garner to sign a written consent to search form, but he refused saying that he would not sign anything to give up his rights.

Trooper Potts placed Garner under arrest for disorderly conduct and for altering his drivers license. Trooper Potts asked Garner if Hooper could drive the vehicle in or if a wrecker should be called. Garner replied that Hooper could drive it. Garner was searched, handcuffed and taken to the Young County jail by Potts. Hooper followed in Garner's truck.

Hooper conducted a routine inventory search of the vehicle while Potts booked Garner. Hooper came into the jail and informed Potts that he had found a small, black, leather-like bag in the front seat which contained a ziplock bag with a cream-colored substance in it. Potts and Hooper went out to the truck and examined the substance. Upon deciding that the substance appeared to be a controlled substance, Potts suggested stopping the inventory and calling the drug dog unit. Potts called Trooper Pellizzari, the DPS drug dog officer, and asked him to come to the Young County jail. Hooper moved the truck into a bay area until the drug dog arrived. Potts carried the small, leather type bag into the jail and asked Garner about it. Garner said he had never seen it before.

Some time later, Pellizzari arrived with the drug dog. He ran the dog around the outside of the vehicle and then put him inside the truck. Pellizzari asked Potts to set the luggage in the pickup on the floor. Upon inspection of the luggage, the drug dog alerted on a black nylon bag. Potts opened the bag which the dog alerted on while Pellizzari watched. The bag contained a shoe box with a Sony video camera and three rolls of ziplock plastic bags, Precision electronic scales, articles of clothing and a clear plastic container with two large bags of a substance appearing to be methamphetamine and several smaller bags of coffee. The officers completed the inventory of the vehicle and found a small green tablet and a glass pipe containing some type of residue. Potts went back into the jail and informed Garner he would be charged with Aggravated Possession of a Controlled Substance[6]. The defendant was arrested for this offense on January 18, 1994. He was indicted in state court on February 24, 1994. The case sat on the docket of the 90th Judicial District Court of Young County for 13 months. After the defendant was charged in federal court (some 14 months after the arrest) by way of the March 7, 1996, indictment, the state action was dismissed on a motion by the State on March 30, 1995. The state constitutional search issue raised in this case was not litigated during the 13 months the case was pending in state court.

## II. Federal Law or State Law

■ The defendant argues in his motion to suppress and his brief that this Court must apply Texas law in deciding the motion to suppress. However, the Fifth Circuit, joining every other circuit in the country, has addressed and rejected that argument. In *United States v. Walker*, the Fifth Circuit stated:

> [T]he proper inquiry in determining whether to exclude the evidence at issue is not whether the state officials' actions were "lawful" or "valid under state law." The question that a federal court must ask when evidence is secured by state officials to be used as evidence against a defendant accused of a federal offense is whether the

---

5. Possessing an altered driver's license or altering a driver's license is a Class C misdemeanor and a violation of Tex.TRANSPORTATION CODE § 521.451.

6. Aggravated Possession of a Controlled Substance is a felony under Tx HEALTH & SAFETY CODE § 481.112.

actions of the state official in securing the evidence violated the Fourth Amendment to the United States Constitution.

960 F.2d 409, 415 (5th Cir.), *cert. denied,* 506 U.S. 967, 113 S.Ct. 443, 121 L.Ed.2d 362 (1992). The reasoning behind this statement of the law is that the exclusionary rule only requires evidence obtained in violation of the Fourth Amendment to be excluded. *Id.* Additionally, the exclusionary rule's purpose is to discourage violations of the Fourth Amendment, not violations of state law. *Id. citing Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Weeks v. United States* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

In support of the argument that state law should be applied and that the Fifth Circuit supports this position, Garner cites *United States v. Rice,* 652 F.2d 521 (5th Cir.1981). In that case, the defendant was convicted of possession of counterfeit bills and conspiracy to pass counterfeit bills. On appeal, Rice challenged the validity of his arrest and the search subsequent to the arrest. In effect, Rice challenged the items found in the search after his arrest as "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). He argued that since his arrest was illegal, all evidence found as a result of the arrest should have been suppressed. In response, the Government argued that the federal court was bound by the law of Texas which allowed a police officer to make a warrantless arrest where he believes, " 'upon representation of a credible person, that a felony has been committed, and that the offender is about to escape . . .' Article 14.04, TEX.CODE CRIM.PRO. (Vernon's 1977)." *Id.* at 525. The Fifth Circuit agreed with the general proposition that the lawfulness of an arrest by state officers is determined by the law of the state where the arrest took place. *Id.* However, in addition to this proposition, the Fifth Circuit emphasized that the arrest must also conform to federal constitutional standards in order to withstand scrutiny. In other words, the question presented in the *Rice* case examined whether the arrest was lawful not only under Texas law, but also under the federal constitutional standards in place at the time. Thus, the Fifth Circuit applied

Fourth Amendment jurisprudence to determine whether "a reasonable man, standing in the officer's shoes, could have believed in light of the facts and circumstances an offense had been committed and that a particular defendant committed it." *Id.* Accordingly, the Fifth Circuit's analysis did not end simply because the law of the state deemed the arrest lawful. The question in this case is not the same question presented in the *Rice* case. The instant question reverses that order and asks whether the search was lawful not only under federal jurisprudence, but also under Texas law. Unfortunately for Garner and other Texas citizens who believe that the Texas Constitution affords them more protection than the United States Constitution, the Fifth Circuit has held that lawfulness of a search or a warrantless arrest under state law is an irrelevant question. As long as the offending state officer can find the federal courthouse, the alleged state constitutional violation by the state officer just does not matter.

Garner further cites *Crone v. United States,* 411 F.2d 251 (5th Cir.1969) in support of the principle that the validity of warrantless arrest should be judged by the law of the state. *Crone* does stand for the principle that the rule in 1969 was that validity of a warrantless arrest is evaluated under the applicable state law, subject to constitutional constraints. *Crone* at 253. However, that principle does not enjoy the same force and effect under current Fifth Circuit jurisprudence.

In *United States v. Wadley,* 59 F.3d 510 (5th Cir.1996), the court addressed an appellant's contention that the Dallas police officers who arrested him did so illegally. In the discussion and analysis of this contention, the Fifth Circuit analyzed the arrest strictly under the federal jurisprudence involving the Fourth Amendment and probable cause, the court did not discuss whether the state officials had apprehended the appellant lawfully under the state law of warrantless arrest. Instead the Court applied federal jurisprudence to a federal criminal appeal and found that the Fourth Amendment requirements

had been satisfied and the arrest was lawful.[7]

An earlier Fifth Circuit opinion is even more noteworthy on the question of whether to apply state or federal law to a warrantless arrest. In *Fields v. City of South Houston,* in the context of a civil § 1983 action, the court held that:

> The United States Constitution does not require a warrant for a misdemeanor not occurring in the presence of the arresting officer.... [W]e hold "there is no cause of action for 'false arrest' under section 1983 unless the arresting officer lacked probable cause." Accordingly, a federal civil rights action will not lie for a warrantless misdemeanor arrest in violation of state law. Section 1983 is a federally created cause of action to redress civil rights violations. "The states are free to impose greater restrictions on arrests, but their citizens do not thereby acquire a greater federal right."

*Fields v. City of South Houston,* 922 F.2d 1183, 1189 (5th Cir.1991). Arguably, this refusal to apply state law in a civil context may not apply to criminal matters, however a footnote in the opinion also questions the continuing validity of state law application in federal criminal cases as well. *Id.* at 1190 n. 7.

Garner also supports his claim that a federal court must apply state law to a motion to suppress with citations to *United States v. Phillips,* 477 F.2d 913, 914 (5th Cir.1973) (per curiam) and *Garner v. Louisiana,* 368 U.S. 157, 166, 82 S.Ct. 248, 253, 7 L.Ed.2d 207 (1961). Neither of these cases supports the action Garner wishes this Court to take. In *Phillips,* the defendant argued that his

motion to suppress should have been granted because the supporting affidavit was sworn to before a municipal court judge in Texas, an officer not authorized to administer oaths. The Fifth Circuit found that the Texas Court of Criminal Appeals had already ruled on the issue and rejected the contention that the complained-of deficiency rendered the warrant unlawful. The Fifth Circuit cited *Garner v. Louisiana* for support of the premise that a federal court accepts the state's interpretation of its own statute.

In *Garner v. Louisiana,* the Supreme Court examined the validity of the defendants' convictions under the Louisiana disorderly conduct statute for having the audacity to sit at a white lunch counter. The Court's determination that it would be bound by the state court's interpretation of what constituted disorderly conduct under the statute applied the time-honored principle that a federal court will not impose its own determination of the meaning of a state statute in the face of clear state authority on the issue. Following this principle, the Court analyzed whether sufficient evidence existed to support the disorderly conduct convictions under state law. *Garner* at 166–67, 82 S.Ct. at 253–54.

Again, the questions presented in these two cases differ from the instant case. In *Phillips* and *Garner,* the courts were asked to apply and interpret state statutes on state law issues. Whether or not evidence should be excluded in a federal prosecution is a question which the Supreme Court has determined should be addressed with reference to federal law alone. The Supreme Court has clearly stated that:

---

7. The Court notes that upon a petition for rehearing en banc, an original member of the three-judge panel retreated from the initial decision that the arrest was based upon probable cause. In reviewing Judge Wiener's vigorous dissent from the refusal to grant a rehearing en banc, in which Chief Judge Politz, Judges Jerry E. Smith, Stewart and Dennis joined, this Judge agrees that the Fifth Circuit's recent jurisprudence in the area of the Fourth Amendment continues to erode and remove the constitutional protections once taken for granted.

In *Wadley,* the panel seemingly created an exception to the principle created in *United States v. Morin,* 665 F.2d 765 (5th Cir.1982). The *Mo-*

*rin* maxim allows a citizen, any citizen, to terminate a simple information-gathering encounter with a police officer by walking away. This choice not to speak to the officer and to walk away could not, under the *Morin* maxim, provide the police officer with probable cause to arrest the individual. However, "[w]hat the [*Wadley*] panel opinion creates and what the denial of rehearing en banc silently confirms is a "Po' Folks" exception to the *Morin* Maxim: From now on, a citizen can decline a police invitation to talk unless that citizen happens to be in a poor, crime-infested, or minority neighborhood." *United States v. Wadley,* 83 F.3d 108 (5th Cir. 1996) (Weiner, J., dissenting).

The question of whether evidence obtained by state officers to be used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search had been conducted by federal officers.

*Preston v. United States*, 376 U.S. 364, 366, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964) *citing Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *see also On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952) (stating that violation of state law, even if shown, will not render the evidence obtained inadmissible in federal court).

To be sure *Elkins* and its progeny have created an anomaly which allows state officials to violate their own constitutions so long as the evidence is ultimately used in a federal proceeding, as previously mentioned above. The opinion's dissenters noted and expounded on the loophole created. Justice Frankfurter, on behalf of four dissenters, noted that the majority's interpretation of the Fourth Amendment allowed the fruits of searches and seizures illegal under state but not federal law to be admitted in federal courts. *Elkins*, 364 U.S. 206, 245, 80 S.Ct. 1453, 1459–60, 4 L.Ed.2d 1688 (1960) (Frankfurter, J., dissenting). Indeed his comments nearly fifty years ago are quite relevant to Garner's modern-day contentions. Frankfurter wrote:

8. In the past, the "silver platter" doctrine allowed federal courts to receive into evidence items which were obtained in a state search by means which, if engaged in by federal officers, would constitute a violation of the Fourth Amendment.

9. The very essence of a healthy federalism depends upon the avoidance of needless conflict between state and federal courts. Yet when a federal court sitting in an exclusionary state admits evidence lawlessly seized by state agents, it not only frustrates state policy, but frustrates that policy in a particularly inappropriate and ironic way. For by admitting the unlawfully seized evidence the federal court serves to defeat the state's effort to assure obedience to the Federal Constitution. In states which have not adopted the exclusionary rule, on the other hand, it would work no conflict with local policy for a federal court to decline to receive evidence unlawfully seized

A state officer who disobeys [a state law or principle] needs only to turn his evidence over to the federal prosecutor, who may freely utilize it under today's innovation in disregard of the disciplinary policy of the State's exclusionary rule. I cannot think of why the federal courts should thus encourage state illegalities.

*Id.* at 245–46, 80 S.Ct. at 1460, (Frankfurter, J., dissenting). Frankfurter went on to propose that federal courts suppress evidence obtained in violation of state law out of comity, as a rule of evidence, apparently under their supervisory powers. *Id.* at 250, 80 S.Ct. at 1462. An argument could be made that the same logic which led to the abolishment of the "silver platter" [8] doctrine supports the suppression in federal court, of evidence obtained in violation of state law. Indeed, the majority noted, "[t]he very essence of healthy federalism depends upon the avoidance of needless conflict between state and federal courts." *Elkins*, 364 U.S. at 221, 80 S.Ct. at 1446. The Court recognized that a lower federal standard for admission of evidence induced subterfuge on the part of law enforcement to insure that the weaker test would be applied. *Id.* at 221–22, 80 S.Ct. at 1446–47 [9]. Justice Frankfurter noted that law enforcement officers would have a similar incentive to obtain a federal forum if a state court and federal court have differing standards for the admission of evidence seized by state authorities.

by state officers. The question with which we deal today affects not at all the freedom of the states to develop and apply their own sanctions in their own way. Free and open cooperation between state and federal law enforcement officers is to be commended and encouraged. Yet that kind of cooperation is hardly promoted by a rule that implicitly invites federal officers to withdraw from such association and at least tacitly to encourage state officers in the disregard of constitutionally protected freedom. If, on the other hand, it is understood that the fruit of an unlawful search by state agents will be inadmissible in a federal trial, there can be no inducement to subterfuge and evasion with respect to federal-state cooperation in criminal investigation. Instead, forthright cooperation under constitutional standards will be promoted and fostered.
*Elkins v. United States*, 364 U.S. 206, 221–22, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960).

This Court humbly agrees with Justice Frankfurter and his dissent. Applying a lower standard of admission to state-seized evidence belies the historic principle that the United States Constitution provides a floor to a citizen's civil rights while the state constitutions provide a ceiling.

The practice of admitting evidence seized in violation of state law is even more troubling today than it was 46 years ago. In 1960, the federal criminal arena was much smaller than it is today. In an age where Congress is creating federal jurisdiction, based ever so loosely on the Commerce Clause, over historic state crimes, the federal courts and Congress have in essence given state law enforcement authorities a choice between evidentiary standards, procedural standards and perhaps most significantly sentencing standards.

Although this Court believes that applying a lower standard to state-seized evidence than the state court would merely encourages state law enforcement to run to the federal courts, thus overburdening an already overburdened system, it has no choice but to follow the jurisprudence of the Supreme Court and its subsequent Fifth Circuit interpretations. Accordingly, the motion to suppress must be evaluated under federal law and its interpretations of the Fourth Amendment.

### III. Application of Federal Law

Garner is only contesting the inventory search of his truck and luggage. However, his brief also addresses, albeit in passing his arrest and possible pretexts for that arrest. Accordingly, the Court will address the pertinent events of that January morning seriatim. The standard of review for a motion to suppress based on live testimony at a suppression hearing is to accept the trial court's factual findings unless clearly erroneous or influenced by an incorrect view of the law. *U.S. v. Piaget*, 915 F.2d 138, 139 (5th Cir. 1990).

#### 1. Warrantless Arrest

■ In order to make a warrantless arrest in a public place, the arresting officers must have probable cause to believe that the suspect has committed, is committing, or is about to commit a crime. *Fontenot v. Cormier*, 56 F.3d 669 (5th Cir.1995); *citing Harper v. Harris County*, 21 F.3d 597, 601 (5th Cir.1994). A warrantless arrest must be based on "probable cause." Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense. *United States v. Levine*, 80 F.3d 129 (5th Cir.1996); *citing United States v. Wadley*, 59 F.3d 510, 512 (5th Cir.1995). The presence of probable cause is a mixed question of fact and law. *Id.*

■ At the time of the arrest, Trooper Potts had seen Garner urinating in public and been given an altered driver's license by Garner. Both of these acts are Class C misdemeanors under Texas law.[10] Clearly, the totality of the facts and circumstances within Potts' knowledge at the moment of the arrest were sufficient for a reasonable person to conclude that Garner had committed an offense.

#### 2. Pretext Arrest

■ Garner appears to suggest in his brief that Potts arrested him as a pretext to search the truck and that the arrest and evidence should be suppressed on this basis. Garner bases this accusation upon the fact that he was formally placed under arrest after he declined to sign a written consent to search form. Based upon the evidence at the motion to suppress hearing and the statement of facts presented in Garner's brief, the Court does not find that Potts arrested Garner as a pretext in order to search the truck. First of all, Garner had already given his oral consent to search the truck. Potts asked Garner if he had any weapons or contraband in the truck and he responded that he did not and the troopers could look if they wanted to do so. Secondly, Potts had already read Garner his rights prior to his refusal to sign a written consent form. The Court finds that Potts had already decided to arrest Gar-

---

**10.** See infra notes 4 & 5.

ner before asking him to sign a written consent form.

### a. Consent

Garner, in response to Potts' question asking if he had any weapons or contraband in the truck, stated that he did not and that the troopers could look. In *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991), the Supreme Court stated that police do not have to separately request permission to search each closed container in a vehicle, and that a driver's general consent to a search of the car includes consent to examine a paper bag on the floor of the car. *Id.* at 251, 111 S.Ct. at 1803–04. The Fifth Circuit, relying on *Jimeno,* has held that an individual's consent to an officer's request to "look inside" his vehicle is equivalent to general consent to search the vehicle and its contents, including containers such as luggage. *United States v. Rich,* 992 F.2d 502, 508 (5th Cir.), *cert. denied,* 510 U.S. 933, 114 S.Ct. 348, 126 L.Ed.2d 312 (1993).

The Court finds that Garner's voluntary offer to look in the truck, especially in context of being read his *Miranda* rights and asked about contraband was a general consent to search the truck for weapons or drugs. By responding negatively to the question about contraband or weapons and expressly inviting the trooper to take a look, he expressly invited the examination of the truck and its contents. Obviously the officer's concern was focused on the possibility of the presence of contraband. Under the facts of this case, it was objectively reasonable for Trooper Potts to conclude that Garner's general invitation to look in the truck included his consent to search containers found within the vehicle that could hold illegal narcotics or weapons. Once general consent is given by the driver, the police may search all containers found within the vehicle unless the consent is expressly limited by the suspect. *See United States v. Crain,* 33 F.3d 480, 484–85 (5th Cir.1994), *cert. denied sub nom., Watkins v. United States,* — U.S. ——, 115 S.Ct. 1142, 130 L.Ed.2d 1102 (1995).

### b. Miranda Warnings

*Miranda* warnings must be given prior to a custodial interrogation. *United States v. Pofahl,* 990 F.2d 1456, 1487 (5th Cir.), *cert. denied,* 510 U.S. 996, 114 S.Ct. 560, 126 L.Ed.2d 460 (1993). "A person is "in custody" for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id.* (internal quotation marks omitted).

The Court finds that Trooper Potts act of mirandizing Garner evinced an intention to conduct some type of custodial interrogation. This action was taken before Garner gave his general oral consent and before he refused to sign a written consent form. Based upon the timing of the *Miranda* warnings the Court concludes that the arrest was not a pretext to conduct a search of the vehicle.

Finally, even if the arrest were a pretext to conduct a search of the vehicle, the subjective motivation of Trooper Potts is irrelevant in the Fifth Circuit. Under *United States v. Causey,* 834 F.2d 1179 (5th Cir. 1987) (en banc), this Court must apply an objective standard when reviewing the conduct of police officers:

> [S]o long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry.

*Causey,* 834 F.2d at 1184. When Trooper Potts placed Garner under arrest for disorderly conduct and altering a driver's license, he was doing no more than he was objectively authorized to do under Texas law. He had observed Garner urinating in public and in possession of an altered driver's license, both state statutory violations. Whether he was looking for drugs in the truck or used the arrest to search the truck is irrelevant.

### 3. Inventory Search

Warrantless searches are presumptively unreasonable. *Horton v. California,* 496 U.S. 128, 133, 110 S.Ct. 2301, 2305–06, 110 L.Ed.2d 112 (1990). However, there

is an exception to the warrant requirement when an officer conducts an inventory of seized property if that inventory is part of a bona fide "routine administrative caretaking function" of the police. *United States v. Skillern*, 947 F.2d 1268, 1275 (5th Cir.1991), *cert. denied*, 503 U.S. 949, 112 S.Ct. 1509, 117 L.Ed.2d 646 (1992). Inventories serve three purposes: (1) to protect the owner's property while it is in police custody; (2) to protect the police against claims or disputes over lost or stolen property; and (3) to protect the police or public from potential danger. *South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000 (1976); *see also United States v. Andrews*, 22 F.3d 1328 (5th Cir.1994) (explaining the inventory search exception and its purposes).

■ The Fourth Amendment requires only that an inventory not be a "ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990); *United States v. Walker*, 931 F.2d 1066, 1068 (5th Cir.1991). "In order to prevent inventory searches from concealing such unguided rummaging, the Supreme Court has dictated that a single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." *United States v. Bullock*, 71 F.3d 171 (5th Cir.1995) *citing United States v. Walker*, 931 F.2d at 1068. The Supreme Court requires that "inventories be conducted according to standardized criteria, although the policy need not be written." *Id.*

■ The United States contends that the inventory search was performed pursuant to standard regulations and procedures. In support of its contention, the government introduced the testimony of a DPS trooper who testified that the DPS had a departmental policy of conducting inventory searches after a driver of a vehicle is arrested. The trooper also testified concerning the DPS policy regarding the opening of containers or luggage. The arresting officers complied with the policy.[11]

## Conclusion

Although this type of state case prosecution by the federal government raises troubling issues of comity that are of great practical concern, this Court bows to higher authority and must follow existing federal law. The arrest and search by the state officers was legal under federal law. This Court need not and does not reach the question as to whether the arrest and search were legal under state law. The Motion to Suppress is **DENIED**.

**SO ORDERED.**

11. The arresting officers also had additional probable cause to search anyway after the drug dog "alerted" on the larger bag where ziploc bags, scales and two large bags of drugs were found.