**UNITED STATES of America,
Plaintiff,**

v.

**Timothy COLEMAN, Defendant.**

**No. 300CR–34X.**

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 30, 2001.

Michael Hawk, Krupkin & Moulliet, Kirk F Lechtenberger, Law Office of Kirk F Lechtenberger, Dallas, for defend.

Candina Sharon Heath, U.S. Attorney's Office, Department of Justice, Dallas, for U.S.

*MEMORANDUM OPINION & ORDER*

KENDALL, District Judge.

Before the Court is Defendant Coleman's Motion to Suppress and the Government's Response. This Motion was the subject of a hearing held on October 3, 2000. On January 12, 2001, the Court granted the Motion to Suppress. The

Court now finds that based on Fifth Circuit binding precedent not raised by the Government, the Court must **VACATE** that previous order and **DENY** the Motion to Suppress.

## I. Background

On August 25, 1998, Defendant Timothy Coleman was being investigated by the police department of Mesquite, Texas, a suburb of Dallas, for possible drug dealing. Coleman was staying at a Ramada Inn in the city limits of Mesquite. Acting on a tip from an informant, Mesquite narcotics officers commenced observation of the Ramada from the parking lot in an unmarked police car. They observed an individual, whose appearance matched the description of Coleman provided by an unidentified informant, emerge from the Ramada and get into a black Cadillac, which was the type of car they had been informed Coleman drove. Coleman left the parking lot in his Cadillac and got onto the Interstate 30 service road. The narcotics officers noticed at that time that Coleman was not wearing his seat belt, which is a violation of the state transportation code.

The officers followed Coleman, but because they were in an unmarked car they did not initiate a traffic stop. Instead, they radioed for the assistance of a marked car which could more easily do so. In the meantime, Coleman drove a couple miles west on I–30, and exited to the north on a street that brought him within the Dallas city limits. The Mesquite narcotics officers followed Coleman in their unmarked car through parts of northeast Dallas, where they also observed him speed through a school zone. Coleman drove to an apartment complex in Dallas. He parked his car and entered the complex for approximately two minutes. When he came out, he got back in his car and started heading toward I–30 the same

way he had come. Shortly after he left the complex, uniformed Mesquite police officers in a marked Mesquite police car caught up with Coleman and the unmarked police car which, unbeknownst to Coleman, was still following him. The Mesquite police car initiated a traffic stop on Coleman inside the Dallas city limits for the seat belt law violation the narcotics officers had witnessed earlier within the Mesquite city limits. Coleman immediately pulled over when the marked car turned on its lights and siren. Officer Pope, who was one of the Mesquite narcotics officers in the unmarked car, testified at the suppression hearing that Coleman never attempted to evade arrest and that although the officers had been "following" him for some time, they had not been "chasing" him. There was no "hot pursuit."

When the officers approached him, Coleman was unable to produce identification or a driver's license. The officers placed him under custodial arrest for the seat belt violation that had occurred in the city of Mesquite, and put him in the marked squad car. The officers searched Coleman's car incident to his arrest. Inside a plastic grocery bag on the passenger floorboard the police found one kilo of cocaine. Under arrest, Coleman signed a statement confessing his possession of the cocaine.

Drug charges against Coleman were initially filed in state court shortly after the arrest, but were later dismissed so the case could be brought in federal court instead. The defendant was indicted in federal court on February 2, 2000, one year and five months after his August 25, 1998 arrest by an all state law enforcement cast.

## II. Unlawful Arrest

█ The arrest of Coleman by the Mesquite police was illegal because the officers were outside of their geographic jurisdic-

tion at the time of the arrest. The Texas Court of Criminal Appeals has made clear that "statutes which confer upon a peace officer the authority to act may not necessarily define the geographic scope of that authority. That geographic scope, if absent from the statute granting authority to act, must find its source in some other statute." *Angel v. State,* 740 S.W.2d 727, 732 (Tex.Cr.App.1987). If a statement of geographic jurisdiction is not provided for by statute, it must be "controlled by common law." *Id.* Under the common law rule, a city police officer's geographic jurisdiction ends at the city limits. *See Landrum v. State,* 751 S.W.2d 530, 531 (Tex. App.—Dallas 1988, writ. ref'd)(citing *Love v. State,* 687 S.W.2d 469, 471 (Tex.App.— Houston [1st Dist.] 1985, writ ref'd)).

A dispute over geographic jurisdiction arises in the present case because at the time *Angel v. State* was decided, police officers from some municipalities had county-wide geographic jurisdiction to make warrantless arrests. A Texas statute provided that city police officers from Type A Municipalities [1] had the same powers and jurisdiction as city marshals. V.A.C.S., Art. 998, *repealed by* Acts 1987, 70th Leg., ch. 149, § 49(1). City marshals, in turn, had the same powers and jurisdiction as the sheriff. V.A.C.S., Art. 999, *repealed by* Acts 1987, 70th Leg., ch. 149, § 49(1). Sheriffs had, and continue to have, county-wide jurisdiction. TEX. CODE CRIM. PROC. ANN. art. 2.17 (Vernon 1977). Mesquite is a Type A municipality. However, in 1995 the Texas state legislature amended the provisions of the Local Government Code that had in effect given Type A city police officers county-wide geographic jurisdiction. In the wake of those amendments, "[a] police officer has

the powers, rights, duties and jurisdiction granted to or imposed on a peace officer by the code of Criminal Procedure." TEX. LOC. GOV'T CODE ANN. § 341.001(e)(1) (Vernon 1999).

Nothing in the Code of Criminal Procedure grants city police officers county-wide jurisdiction to make warrantless arrests. Under the Code of Criminal Procedure, a peace officer's geographic jurisdiction depends on the type of peace officer whose conduct is at issue, and the offense for which the arrest is made. TEX. CODE CRIM. PROC. ANN. art. 14.03 (Vernon Supp.2001). Article 14.03(d) provides:

> A police officer who is outside his jurisdiction may arrest, without warrant, a person who commits an offense within the officer's presence or view, if the offense is a felony, a violation of Title 9, Chapter 42 Penal Code, a breach of the peace, or an offense under Section 49.02, Penal Code.

Article 14.03(g) provides:

> A peace officer listed in Subdivision (1), (2), (3), (4), or (5), Article 2.12, who is licensed under Chapter 415, Government Code, and is outside the officer's jurisdiction may arrest without a warrant a person who commits any offense within the officer's presence or view, *except that an officer who is outside the officer's jurisdiction may arrest a person for a violation of Subtitle C, Title 7, Transportation Code, only if the officer is listed in Subdivision (4) Article 2.12.*

Art. 14.03(g)(emphasis added). Article 14.03(g) affirmatively authorizes only "rangers and officers commissioned by the Public Safety Commission and the Director of the Department of Public Safety" (officers listed in Subdivision (4)) to make

---

[1]. Texas general municipalities are classified as Type A, B, or C. The differences between them are largely matters of size and incorpo-

ration procedure. TEX. LOC. GOV'T CODE ANN. §§ 6.001–8.003 (Vernon 1999).

extra-jurisdictional arrests for traffic violations. TEX. CODE CRIM. PROC. ANN. art. 2.12 (Vernon Supp.2001). Arrests for traffic violations (Subtitle C, Title 7, Transportation Code) are expressly carved out as beyond the reach of non-subdivision (4) officers who are outside of their jurisdiction. City police officers are not subdivision (4) officers. Because there is no other statute establishing the geographic scope of a city police officer's power to make arrests for traffic violations, *Angel v. State* dictates that common law controls. At common law, the city officer's authority ends at the city limits. Therefore, an arrest for a traffic violation by a city officer outside of his or her city limits is a violation of Texas law.[2]

The leading (though unpublished) post-*Angel* case also reads the Texas Code of Criminal Procedure as not granting city police officers the authority to make traffic stops outside of their geographic jurisdiction. *Yeager v. State*, 23 S.W.3d 566, 2000 WL 798080 (Tex.App.—Waco June 21, 2000, pet. pending). In *Yeager*, two officers from a Type B municipality, Pantego Village, observed the defendant driving erratically within the Pantego Village city limits. They followed him into the neighboring City of Arlington, where they witnessed additional dangerous driving they believed might be consistent with intoxication. The officers initiated a traffic stop on Defendant Yeager, at which point based on his slurred speech and the odor of alcohol on his breath they found probable cause to arrest him for drunk driving. The court reversed the trial court's denial of the motion to suppress evidence of the Defendant's drunken state, because Article 14.03 did not affirmatively grant the officers the right to conduct an extra-jurisdictional investigative detention.

The Government argues that *Yeager* is distinguishable from the present case because that case involved officers from a Type B municipality while the present case involves officers from a Type A municipality. This distinction no longer matters for the purposes of geographic jurisdiction of municipal officers. After the 1995 amendments, the geographic jurisdiction of police officers depends not on the type of municipality they work for, but the officer's classification under Article 2.12 of the Code of Criminal Procedure. The only reason the Type B category mattered in *Yeager* was because even the pre–1995 rule in *Angel* would not have given the Pantego Village officers county-wide jurisdiction. *See id.* at 571 n. 3. No Texas statute(s) ever granted Type B officers the same county-wide geographic authority as sheriffs.

The Government also argues that city police officers are granted authority to make warrantless arrests for traffic violations outside of their city limits as long as the violation occurred within their city limits. The plain language of the statute does not support this argument. The geographic limit imposed by Article 14.03(g) does not turn on the place of the offense, but the physical location of the officer at the time of the arrest. "An officer who is outside the officer's jurisdiction may arrest a person for [a traffic violation] only if the officer is listed in Subdivision (4), Article 2.12." TEX. CODE CRIM. PROC. ANN. art. 14.03(g) (Vernon Supp.2001).

In the present case, the Mesquite narcotics officers arrested Defendant Coleman for not wearing his seat belt, which is a violation of Subtitle C, Title 7 of the Texas Transportation Code. TEX. TRANSP. CODE ANN. § 545.413 (Vernon 1999). The Mesquite narcotics officers were in the City of

2. This general rule is subject to a "hot pursuit" exception which, as discussed in the Background section of this opinion, is not at issue in this case.

Dallas when they made the arrest. None of the arresting Mesquite officers were rangers or officers commissioned by the Texas Safety Commission. Therefore, Coleman's arrest violated the limit on police authority imposed by Texas law. Texas law prohibits evidence obtained in violation of any provision of the laws of the State of Texas from being admitted against the accused in a criminal case. TEX. CODE. CRIM. PROC. ANN. art. 38.23(a) (Vernon 1979 & Supp.2001). If the state court prosecution had proceeded against Coleman, the evidence obtained incident to his traffic arrest (and fruits thereof) would no doubt have been suppressed. It is no accident that this 1998 state case was dismissed before trial and brought to federal court in 2000.

### III. Exclusion of the Evidence in Federal Court

■ Although the arrest was illegal under Texas law, this Court has no choice under current Fifth Circuit precedent but to deny Defendant's Motion to Suppress the evidence seized by the Mesquite police officers. In the Fifth Circuit, courts may only exclude evidence seized by state officers if the evidence was seized in violation of the Fourth Amendment, as applied to the states via the Fourteenth Amendment. It makes no difference under current Fifth Circuit precedent if the state officers violated their own state's constitution and laws that they swore an oath to uphold.

Two Fifth Circuit Cases control the outcome of the present motion to suppress. In *United States v. Garcia*, 676 F.2d 1086 (5th Cir.1982), the Fifth Circuit considered a motion to suppress in a case involving state officers who had exceeded their jurisdiction under state law in making an arrest. The arresting officers in *Garcia* were state game wardens who had stopped a suspicious vehicle and searched it for

drugs. The Fifth Circuit panel engaged in a thorough examination of the functional and geographic jurisdictional limits Texas law imposed on game wardens to make arrests. *Id.* at 1089–93. The court concluded that the game wardens had exceeded their authority under state law because the arrests occurred outside of a state park, and were not made in connection with suspected violations of state gaming laws. *Id.* at 1093–94. Because the court concluded that the arrests had been illegal, "it follows that the evidentiary fruits of those unlawful arrests should not have been introduced at defendants' trial." *Id.* at 1094. Accordingly, the *Garcia* court reversed the convictions of the three defendants.

But *Garcia* was not the last word on the relevance of state law violations to a motion to suppress in federal court. On appeal by the government, the United States Supreme Court issued a somewhat strange three-sentence order vacating the Fifth Circuit's judgment and remanding the case for reconsideration in light of the recently decided *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), which concerned the ability to search closed containers in an automobile. The Fifth Circuit subsequently stated, "[b]y remanding *Garcia* for reconsideration in light of the fourth amendment standards announced in *Ross*, the Court perforce instructed that state law did not control the case and that the admissibility of evidence depends on the legality of the search and seizure under federal law." *United States v. Mahoney*, 712 F.2d 956, 959 (5th Cir. 1983). Several months later, the original *Garcia* panel agreed with *Mahoney*'s interpretation, stating, "[w]e can make nothing of the Court's remand of this cause for reconsideration in *Ross*'s light unless it be an indication that our former disposition took it up by the wrong end; that our focus should be upon the constitutional

question rather than upon the arresting state officers' powers." *United States v. Garcia*, 719 F.2d 108, 109 (5th Cir.1983)[hereinafter *Garcia II* ].[3] In the wake of the Supreme Court's reversal and remand, the Fifth Circuit no longer believed it proper to consider the jurisdiction of state law officers in determining whether evidence seized by them should be suppressed in federal court.

The Fifth Circuit reiterated this approach in a much more recent case. In *United States v. Jones*, 185 F.3d 459 (5th Cir.1999), cert. denied, 531 U.S. 850, 121 S.Ct. 125, 148 L.Ed.2d 79 (2000), the Fifth Circuit held that a district court properly denied a motion to suppress which was based on a defect in the arresting state officer's authority. In that case, the deputy sheriff who initiated the traffic stop was not in compliance with a Louisiana statute that requires sheriffs' offices to post a bond with the county clerk on behalf of all deputy sheriffs. *Id.* at 462. The court characterized this as a state law "administrative deficiency" that did not warrant suppression in light of the *Garcia* reversal and subsequent Fifth Circuit interpretations of it. *Id.* at 463. Because the deputy sheriff had probable cause to make the traffic stop, the motion to suppress evidence seized incident to the arrest was properly denied.

Outside the context of the sort of jurisdictional defects at issue in *Garcia* and to a lesser extent *Jones*, the Fifth Circuit has universally held that violations of state law by state officers do not warrant exclusion of the evidence in a federal prosecution. *See United States v. Eastland*, 989 F.2d 760 (5th Cir.1993)(declining to find possible

violation of state trespassing law warranted exclusion of evidence seized by state officers); *United States v. Walker*, 960 F.2d 409 (5th Cir.1992)(declining to apply state standards to a warrantless arrest); *United States v. Mahoney*, 712 F.2d 956 (5th Cir.1983)(finding it improper to apply state arrest warrant standards to a federal warrant). As discussed below, the Court has not identified any exceptions in existing Fifth Circuit law that would compel suppression of the evidence in Coleman's federal case.

## A. Comity and Federalism

The present case involves evidence collected by state officers, in a search incident to an arrest for a state traffic law, when the arrest violated constraints imposed by state law. The evidence was turned over to a federal prosecutor, for use in a federal court, even though federal agents would not have had a basis for initiating the arrest that produced the evidence. This is not a new strategy. *See United States v. Garner*, 945 F.Supp. 990 (N.D.Tex.1996)(Kendall, J.), *aff'd*, 136 F.3d 138 (5th Cir.1998)(denying a motion to suppress because Fifth Circuit law precludes consideration of state law violations with respect to evidence seized by state officers). This Court humbly submits that in the interests of federalism, an exception to the Fifth Circuit's uniform rule may be warranted when evidence obtained by state officers could not have been obtained by federal officers. Current Fifth Circuit precedent, however, as in *Garner*, renders such an exception unavailing.

---

**3.** In this Court's view, like that of the dissent in *Garcia II*, it was not necessary to reach the rule in *Ross* given a state law illegality in the arrest. *See Garcia II*, 719 F.2d at 109 (Goldberg, J., dissenting). The Fifth Circuit's expansive interpretation of the Supreme

Court's *Garcia* remand has had the (perhaps unintended) consequence of encouraging the federalization of state cases where a state officer makes an illegal arrest under state constitutional or statutory law.

Under the law of this Circuit, federal prosecutors have free reign to make use of evidence obtained in violation of state law that federal officers would not have been able to obtain on their own, and that would have been suppressed in state court. The ability to make warrantless arrests for traffic stops is a fairly obvious investigatory tool available to state officers because the Fourth Amendment is not read as prohibiting the use of pretextual traffic stops. *Whren v. United States*, 517 U.S. 806, 819, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Escalante*, 239 F.3d 678 (5th Cir.2001)(involving the use of a traffic stop to deploy a drug sniffing dog). However, traffic stops are a tool that the state of Texas has chosen to limit. As discussed above, officers who are not commissioned by the Texas Department of Public Safety have limited geographic jurisdiction to make traffic stops. These constraints are effectively nullified when any state officer who has exceeded his or her authority can turn over drug evidence to an Assistant U.S. Attorney willing to take the case. The present federal prosecution delinks the state-authorized power to arrest for traffic stops from the corresponding constraints on that power imposed by the State of Texas.

This Court is not the first to recognize the incentive structure that emerges from such a rule. In *Elkins v. United States*, 364 U.S. 206, 223, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), the Supreme Court held that in criminal proceedings, federal courts must exclude evidence obtained by state officers which, if obtained by federal officers, would have violated the defendant's Fourth Amendment rights. In his dissenting opinion, Justice Frankfurter disapproved of the rule under which the Fourth Amendment is the measure of the admissibility of evidence with respect to evidence seized by state officers:

The Court's new rule potentially frustrates and creates undesirable conflict with valid and praiseworthy state policies which attempt to protect individuals from unlawful police conduct.... The Court's new rule will, for example, admit evidence illegally seized under a state law which is identical to a federal statute restricting federal officers, so long as the federal statute goes beyond the minimum requirements of the Constitution.... A state officer who disobeys [a state regulation] needs only to turn his evidence over to the federal prosecutor, who may freely utilize it under today's innovation in disregard of the disciplinary policy of the State's exclusionary rule. I cannot think why the federal courts should thus encourage state illegalities.

*Id.* at 245–46, 80 S.Ct. 1437 (Frankfurter, J., dissenting). Instead, Justice Frankfurter believed that federal courts should treat evidence seized by state officers exactly as state courts would treat it, and that the Fourth Amendment itself should not be the benchmark. While this Court accepts that the Fourth Amendment (as applied to the states through the Fourteenth Amendment) should serve as a minimum standard of behavior for state officers, this Court agrees with Justice Frankfurter's assessment that admission of unlawfully seized evidence undermines state law and encourages state illegalities.

Some courts have questioned whether the handoff of evidence on the proverbial "silver platter" from state officials to federal officials really occurs. The Second Circuit states, "[a] state prosecutor whose case relies on evidence that may be inadmissible in a state court trial has no power or authority to effect a prosecution in federal court. The initiation of a federal prosecution depends entirely on the discretion of the federal prosecutor." *United States v. Pforzheimer*, 826 F.2d 200, 204

(2d Cir.1987). But why would a federal prosecutor decline to prosecute a case under federal drug laws if the major defect in the case is not recognized by the federal courts? The Court is unaware of any studies quantifying the number of federal prosecutions that are based on evidence unlawfully seized by state officers,[4] but the Court notes that in its experience with similar cases in the past, and as evidenced by the history of this case, the problem first identified by Justice Frankfurter is more than theoretical. Forum shopping is not a myth.

The potential for undermining state law is heightened given growing federalization of crimes traditionally legislated and prosecuted by the states. *See Garner,* 945 F.Supp. at 992 n. 2. When the substantive laws overlap, there is an increasing motive for federal prosecutors to take advantage of evidence unlawfully obtained by state officers, in a way that undermines the exclusionary consequence states impose to discourage such illegalities. Such an outcome is inconsistent with the notion of comity, which the Supreme Court has defined as:

> [A] proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways .... The concept does not mean blind deference to "States' Rights" any more than it means centralization of control over every important issue in our National Government and its courts.

The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The Court has no means of quantifying the reduction, if any, in deterrent effect that federal prosecutions using unlawfully obtained evidence might have on state exclusionary rules. Some courts have suggested that states frustrated by federal use of evidence unlawfully obtained by state officers might adopt other policies to deter such conduct. *See United States v. Delaporte,* 42 F.3d 1118, 1119 (7th Cir.1994). But to remove a consequence that State legislatures have selected as a preferred deterrent demonstrates a marked insensitivity to the legitimate interests of the states in controlling their own officers. For example, the State of Texas recently outlawed "racial profiling," defined as "law enforcement-initiated action based on an individual's race, ethnicity, or national origin rather than on the individual's behavior or on information identifying the individual as having engaged in criminal activity." *See* Act of May 24, 2001, 77th Leg., R.S., ch. 947, Tex. Sess. Law Serv. (effective September 1, 2001). Will violations of this law, to the extent that it exceeds the floor set by the Fourteenth Amendment, not warrant suppression of evidence in federal court?[5] The federal

---

4. 1,583 drug offenders booked into the custody of the United States Marshals Service between October 1, 1998 and September 30, 1999 were arrested by state and local law enforcement agencies. *See* COMPENDIUM OF

FEDERAL JUSTICE STATISTICS, 1999, 16 (Table 1.2) U.S. DEP'T OF JUSTICE, NCJ 186179 (April 2001).

5. The Texas racial profiling law is a significant example of a state being ahead of federal

interest in disregarding illegal conduct by state officers, particularly in the traffic stop context, is questionable; any drug evidence seized incident to a traffic stop is a pure bonus anyway as far as enforcement of federal drug laws is concerned, as Congress has not generated a federal traffic code to be wielded in the war on drugs.

The Fifth Circuit has rejected federalism as a rationale for district courts to exercise their supervisory powers to exclude evidence in violation of federal law. *See Eastland,* 989 F.2d at 766. In *Eastland,* the Court determined that, "a number of obvious, strong policy considerations militate against the exclusion of evidence obtained in violation of state law," those being (1) a disruption in uniformity of evidentiary rules among federal courts, and (2) the involvement of federal courts in "difficult interpretations of state statutory and constitutional law." *Id.* at 766–67.[6] In his *Elkins* dissent, Justice Frankfurter also discussed and acknowledged those two difficulties, but concluded that those difficulties were outweighed by the unseemliness of admitting evidence illegally obtained by state officials in the course of a purely state investigation, and the benefits to federalism of avoiding such incongruities with state law. *Elkins,* 364 U.S. at 250–51, 80 S.Ct. 1437 (Frankfurter, J., dissenting). Furthermore, the federal courts have routinely interpreted state statutory and constitutional law in civil cases since *Erie R.R. Co. v. Tompkins.* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

*Eastland*'s rejection of federalism as a basis for exclusion was also due to the Fifth Circuit's previous holding that the Supreme Court "is no longer interested in using its supervisory power to exclude evidence obtained unlawfully but under circumstances not violative of the Fourth Amendment." *See Walker,* 960 F.2d at 416 (citing *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980)). *Payner*'s holding, however, rejected use of supervisory powers to suppress evidence illegally seized from a third party who was not a defendant in the case. *Id.* at 735, 100 S.Ct. 2439. It is not clear that *Payner* generally abandoned "supervisory power" as a basis for excluding evidence, because the Supreme Court also stated, "[f]ederal courts may use their supervisory power in some circumstances to exclude evidence taken from the *defendant* by 'willful disobedience of law.'" *Id.* at 735 n. 7, 100 S.Ct. 2439 (emphasis in original); *but see* George E. Dix, *Nonconstitutional Exclusionary Rules in Criminal Procedure,* 27 AM. CRIM. L. REV. 53, 86–87 (1989)(observing that appellate courts generally have refrained from invoking "supervisory authority" to exclude evidence after *Payner*).

In any event, application of state exclusionary law as a matter of comity is not necessarily reliant on the use of "supervisory authority" as that term was used in *McNabb v. United States,* 318 U.S. 332, 341, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and *Payner.* The Ninth Circuit has endorsed a comity rationale for exclusion of evidence

---

law enforcement regulation. The End Racial Profiling Act of 2001, which would prohibit racial profiling by federal, state and local law enforcement agencies, has been introduced in Congress but has not yet been enacted. *See* S. 989, 107th Cong. (2001)(reprinted in 147 Cong. Rec. S5893 (2001)); H.R.2074, 107th Cong. (2001)(introduced in 147 Cong. Rec. E1037 (2001)).

**6.** The Court notes that in this case there is no difficulty at all in reading the plain meaning of a straightforward provision such as the Texas Code of Criminal Procedure article 14.03(g).

seized by state officers in violation of state law, without discussion of federal court "supervisory powers." *See United States v. Henderson,* 721 F.2d 662, 665 (9th Cir.1983)(suggesting in dicta that "federal courts should, in the interest of comity, defer to a state's more stringent exclusionary rule with respect to evidence secured without federal involvement."). Some language from First Circuit cases also suggests that exclusion of evidence on the basis of state law violations might be proper if "state police were doing what federal officers could not do." *See United States v. One Parcel of Real Property,* 873 F.2d 7, 8 (1st Cir.1989); *see also United States v. Aiudi,* 835 F.2d 943, 946 (1st Cir.1987)(considering whether any incentive existed for federal officials to encourage violations of state law by state officers).

The *Eastland* court stated in a footnote that it did not yet resolve the issue of whether there could be "an instance of abuse and/or collusion in which a court might choose to exercise its supervisory powers" to exclude evidence obtained in violation of state law. *Id.* at 767 n. 11. The record in the present case does not reflect that any agent of the federal government encouraged the illegal traffic stop, or was in any way involved in the investigation of Defendant Coleman. In fact, it is unlikely that the Federal Government had any awareness of this case until a prosecutor in the state court system woke up and smelled the coffee after looking at the facts and the law, and wisely passed along the file to his or her federal counterparts. The First Circuit case cited in the *Eastland* footnote, *United States v. Sutherland,* 929 F.2d 765, 771 (1st Cir.1991)(citing *Pforzheimer,* 826 F.2d at 204), rejected forum shopping as sufficient to trigger a possible "flagrant abuse" exception. *See also Delaporte,* 42 F.3d at 1120 (reading *Sutherland* as not leaving open an excep-

tion at all). This Court is not sure that forum shopping is the type of "abuse and/or collusion" the Fifth Circuit meant by that footnote, and so will not try to shove the present case through the crack in the door left by that possible exception. That is for the Fifth Circuit to decide.

This Court continues to hope that the Fifth Circuit will revisit the federalism issues raised by the use in federal court of evidence unlawfully seized by state officers, especially when federal officers could not have obtained the evidence on their own. It is not clear that the Supreme Court's decision in *Elkins v. United States* was meant to foreclose federal courts from excluding evidence unlawfully seized by state agents as a matter of comity in certain circumstances.

**B. Fourth Amendment and Unlawful Arrest**

The Court also has concerns about whether the seizure of evidence incident to an unlawful arrest violates the Fourth Amendment of the United States Constitution. Independently of federalism concerns, Supreme Court precedent has held state law to be relevant to Fourth Amendment analysis in cases where a search has been made incident to a warrantless arrest. Evidence that is seized as the product of an arrest is not admissible under the Fourth Amendment if the arrest was not lawful. *Ker v. State of California,* 374 U.S. 23, 35, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The lawfulness of an arrest made without a warrant must be based on probable cause. *Id.* However, "the lawfulness of arrests for federal offenses is [also] to be determined by reference to state law insofar as it is not violative of the Federal Constitution." *Id.* at 37, 83 S.Ct. 1623 (citing *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); *United States v. Di Re,* 332 U.S. 581, 589,

68 S.Ct. 222, 92 L.Ed. 210 (1948)(holding that "in absence of an applicable federal statute the law of the state where an arrest without a warrant takes place determines its validity"); *Johnson v. United States,* 333 U.S. 10, 15, n. 5, 68 S.Ct. 367, 92 L.Ed. 436 (1948)). This Court recognizes that, "[t]he question of whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers." *See Preston* 376 U.S. at 365, 84 S.Ct. 881 (paraphrasing language in *Elkins* ). However, it does not follow from this interpretation of *Elkins* that state law is never relevant to Fourth Amendment analysis, although *Elkins* has repeatedly been cited in support of that proposition.[7]

*Ker,* which as far as this Court can tell is still good law, says that lawfulness of an arrest made by state or federal officials must be determined in part by reference to state law. When an arrest by state officers is not lawful under state law, evidence seized incident to the arrest is not admissible. The Ninth Circuit has applied this reasoning, and views the legality of a warrantless arrest under state law as an exception to the general rule that state law is not relevant to suppression of evidence in federal prosecutions. *See United States v. Cormier,* 220 F.3d 1103, 1111–12 (9th Cir.2000), cert. denied, —— U.S. ——, 121 S.Ct. 1146, 148 L.Ed.2d 1009 (Feb. 20, 2001); *United States v. Mota,* 982 F.2d 1384, 1386–89 (9th Cir.1993). Some members of the Eighth Circuit also have recently expressed concern about reading *Elkins* as absolutely foreclosing consider-

ation of state law in Fourth Amendment analysis. *See United States v. Lewis,* 183 F.3d 791 (8th Cir.1999), cert. denied, 528 U.S. 1163, 120 S.Ct. 1180, 145 L.Ed.2d 1087 (2000)(Heaney, J., concurring; Goldberg, J., concurring). Whatever the rationale for considering violations of state law in the context of arrests but not actual searches made by state officers, current Supreme Court precedent seems to support such a distinction. *See* Kenneth J. Melilli, *Exclusion of Evidence in Federal Prosecutions on the Basis of State Law,* 22 GA. L. REV. 667, 713–721 (1988)(questioning the basis for the arrest/search distinction).

After concluding that the Supreme Court's reversal of *Garcia* meant that state law should not be considered, the Fifth Circuit in *Mahoney* stated:

> Assuming the threshold proposition that the legality of a state officer's conduct may be measured by state law, a proposition that we do not here decide, it does not follow that state law should govern a federal court's decision whether to admit evidence that is tainted by illegal conduct. . . . We view the inquiry as a distinct inquiry into the utility in a given case of the remedial device of exclusion, a creature of the federal courts. . . . Because it is a creature of the federal courts and because it ought to be applied in a manner that promotes uniformity in federal cases, federal law must guide our decision whether to apply the exclusionary rule whether or not the legality of the underlying arrest or search turns on state law.

*Mahoney,* 712 F.2d at 959. In effect, the *Mahoney* panel read the Supreme Court's

---

**7.** There is a strong argument that *Elkins* should be limited to the premise of its rule; a rule that the validity of a search and seizure should be determined as if it had been made by federal officers should not be read as rejecting the application of state law to a search

and seizure that never could have been made by federal officers in the first place. Such is the case with a search incident to a seat belt violation. No federal officer could have arrested the defendant in this case.

remand of *Garcia* as implicitly overruling *Di Re* (1948), *Ker* (1963), and *DeFillippo*, 443 U.S. 31, 36, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979), each of which had stated that the legality of an arrest under state law was relevant to Fourth Amendment analysis and the exclusionary rule.[8]

Likewise, the more recent *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), has been interpreted as rendering state law irrelevant to all links in the chain of fourth amendment analysis. *See Eastland*, 989 F.2d at 766–67; *Walker*, 960 F.2d at 415–16; *Fields v. South Houston*, 922 F.2d 1183, 1189–90 n. 7 (5th Cir.1991). *Greenwood* involved the search of garbage bags the defendant had left sitting on a curb, and did not involve evidence seized incident to an *arrest*. The Supreme Court stated:

> Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution. We have never intimated, however, that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs.

*Greenwood*, 486 U.S. at 43, 108 S.Ct. 1625. After this statement, the Supreme Court more narrowly held that expectations of privacy under the Fourth Amendment do not vary depending on the state in which the seizure occurs. *Id.* at 44, 108 S.Ct. 1625. It is unclear why, in cases where a search is incident to an arrest, *Greenwood* bears on the antecedent issue of whether the arrest justifying the search was "lawful" under both the Fourth Amendment (i.e. supported by probable cause) and state law.

In the present case, the only justification for searching Coleman's car was incident to his unlawful arrest. *Ker* seems to dictate suppression of such evidence. Despite these concerns, this Court took an oath to follow the law, even when it has a different point of view. This Court is prohibited by *Mahoney* and its progeny from considering the legality of the underlying arrest under state law unless the Fifth Circuit sees fit to revisit these issues.

### IV. Conclusion

For the reasons stated above, the Court **VACATES** the previous order of January 12, 2001 and **DENIES** the Motion to Suppress.

**SO ORDERED.**

---

**8.** In *Mahoney*, the Fifth Circuit appears to have concluded that *Elkins v. United States* (1960) overruled *United State v. Di Re* (1948) when *Elkins* stated, "the test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *See Mahoney*, 712 F.2d at 959 n. 3 (quoting *Elkins*, 364 U.S. at 224, 80 S.Ct. 1437); see also *Walker*, 960 F.2d at 416 (explaining that *Elkins* overruled *Di Re* ). But the Fifth Circuit did not then, and has not since, addressed the fact that three years after *Elkins*, *Ker* cited *Di Re* for the very proposition *Elkins* is said to have overruled.